**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Barbara BROWN, Defendant–Appellant.**

No. 89–1836.

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 9, 1990.

Decided April 24, 1990.

**1099**

Guideline § 3C1.1 for obstruction. We affirm the district court's sentence.

## I.

As part of its inspection service, the United States Postal Service employs postal inspectors who work on an undercover team. These inspectors pose as "fences", i.e., individuals who buy and sell checks stolen from the mail, in an effort to arrest persons who steal checks out of the mail. The inspectors use paid confidential informants who are paid primarily to introduce persons who possess stolen checks to undercover inspectors who buy the checks. After the initial purchase, the inspectors then arrange with the sellers to buy more checks in the future. Under the Service's practice, it is not until after the inspectors buy stolen checks from a seller for the third time that they arrest the sellers.

The defendant, Barbara Brown, was such a paid confidential informant for the postal inspectors from May, 1985, to November, 1987. During much of that period, Brown was a successful informant introducing a number of persons who had stolen checks to the postal inspectors, resulting in numerous arrests. In September, 1987, however, Brown's pattern of introductions began to change. Rather than steadily introducing persons who would make future sales, Brown began introducing persons to the inspectors more frequently who would only meet with the inspectors once. Between September and November of 1987, Brown arranged twelve introductions, none of which resulted in a sufficient number of transactions for the inspectors to make an arrest.

It became apparent to the inspectors that Brown had begun "playing both sides of the fence." Brown had evidently learned a scheme from Jerry Mosley, a former postal informant fired for engaging in this scheme, where Brown would introduce third parties between the actual check thieves and the inspectors. These impostors, rather than meeting with the inspectors several times, as was supposed to occur under the informant's duty, would only meet with the inspectors once or twice, and

Thomas M. Durkin, Steven Shobat, Asst. U.S. Attys., Chicago, Ill., for plaintiff-appellee.

Michael G. Logan, Chicago, Ill., for defendant-appellant.

Before COFFEY, FLAUM and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Barbara Brown, an informant for the United States Postal Service, was arrested for wanting too much of a good thing. While being paid to lure persons that stole checks from the mail to postal inspectors, she decided to frustrate the inspectors efforts and make some extra money for herself. The Postal Service caught on to her scheme and she was arrested and convicted for conspiring to possess and for unlawfully possessing the contents of stolen mail. Pursuant to the Sentencing Guidelines, Brown was sentenced to 41 months incarceration based on an Offense Level of 15. Brown alleges that the court improperly enhanced her Offense Level by two levels under Guideline § 3B1.1(c) on the finding that she played an aggravating role in the offense. She also claims the court erred in enhancing an additional two levels under

then new imposters would replace them. Under this practice, Brown was assured that no one would be arrested because she knew of the inspector's practice of arresting only after the third buy. Therefore, and this was the beauty of the scheme for Brown, the inspectors would buy the stolen checks and arrest no one, while Brown on the other hand, would receive money as a paid informant from the inspectors for introducing the alleged source of the stolen checks and would also receive a kick back from the imposter out of the proceeds paid by the inspectors for the checks.

Mosley and Brown worked together on this scheme for some period of time. Their primary sources of stolen checks were John White and Anna Marie Tetter. White in turn received the checks from individuals known only as "Little Al" and "Big Ed." Although the checks were not always received in the same manner, apparently they were usually given to White, who then gave them to Mosley, who in turn gave them to Brown. Brown would then take the checks and enlist someone to pose as a setter of stolen checks to the inspectors, and later she would return to White with the money. Brown occasionally called White on her own to get checks without relying on Mosley. Brown also called Tetter directly for checks about ten times between July and November, 1987.

On October 5, 1987, Brown and an unknown man, (there is some doubt as to whether that man was Jerry Mosley), met with Jerome McElroy who was recruited by them to pass off a check to an inspector. Brown drove McElroy to the meeting site and instructed McElroy on how to respond to the inspectors. After McElroy passed the check he handed the money to Brown, who paid him and dropped him off.

On November 3, 1987, Brown, accompanied by her friend Hassan Haaris, went to Tetter's apartment to pick up some checks. After viewing the checks, Brown returned some back to Tetter because they had "hot" zip codes but kept the rest. Brown explained to Haaris, who knew nothing of the scheme, how much the inspectors would pay for the checks. She also described how the introduction would take place, the questions the inspectors would ask, and that the inspector would give the seller a telephone number to use to set up future deals.

On November 4, after learning of the scheme the day before, Haaris asked Brown whether he could pass the checks. Brown and Haaris then travelled to a Burger King restaurant where Brown arranged for a meeting to take place. Once there, Brown met with the postal inspector and informed him that she had a source named Ronnie who had four checks. Brown was then paid by the inspector and returned to Haaris.

Haaris then entered the inspector's vehicle and using the name Ron, produced four checks. The inspector asked whether the source of the checks was an armed robbery or other violent act. Haaris, giving the response coached by Brown, informed him they were from the mail. The inspector then asked if he could get "fresh" checks, to which Haaris responded he could get them right away. The inspector paid Haaris for the checks and gave the arrest signal. Brown and Haaris were arrested.

Following their release on bond, Brown and Haaris returned to the crime scene to retrieve the car they drove to the Burger King. Haaris later testified at trial that Brown took out several checks from the trunk of the car that day and stated to Haaris that "[i]f we would have took [sic] these we would really have been in trouble." She then tore up the checks. White, however, testified at trial that Brown only received three or four checks in the deal. Tetter also testified there were only three to five checks total.

On January 11, 1988, a grand jury returned a two-count indictment against defendants Haaris and Brown. Count One of the indictment charged the defendants with conspiring to possess the contents of stolen mail in violation of Title 18, U.S.C. § 371. Count Two charged both defendants with unlawfully possessing the contents of stolen mail in violation of Title 18, U.S.C. § 1708. Brown entered a plea of not

guilty, while Haaris pleaded guilty pursuant to a plea agreement.

On March 23, 1988, after a two-day trial, a jury returned its verdict finding Brown guilty on both counts. The district court entered judgment on the jury verdict and directed the probation department to prepare a presentence investigation report.

After learning of the contents of the presentence report, Brown filed written objections to the Guideline calculations prepared by the Probation Department. Specifically, she objected to the two level enhancement under Sentencing Guideline § 3B1.1(c) for her alleged aggravating role in the offense as an organizer, leader, manager or supervisor. She also objected to the calculation of her Criminal History Category. Finally, she objected to the two level enhancement under Sentencing Guideline § 3C1.1 for obstruction based on the destruction of postal checks.

At sentencing, the district court overruled Brown's objections and found that the two level enhancements for the aggravating role in the offense and for obstruction were appropriate. The defendant's total Offense Level was, therefore, 15 and her Criminal History Category was Category VI.[1] The applicable Guideline range was 41 to 51 months.

On April 17, 1989, Brown was sentenced to 41 months incarceration for both Counts One and Two, the sentences to run concurrently. She was also required to pay a special assessment of $100 and to serve a term of two years supervised release following her release from custody. Defendant filed a notice of appeal from the sentence and judgment.

## II.

Brown appeals the sentencing court's finding that she was an organizer, manager, or leader under § 3B1.1 of the Sentencing Guidelines. Brown claims that the finding was clearly erroneous because she did not set up the scheme, recruit Haaris,

steal the checks, or claim a larger share of the profits and, therefore, cannot qualify under § 3B1.1. In fact, she claims her participation was merely that of a pawn and therefore, the two level enhancement was improper.

Section 3B1.1 entitled "Aggravating Role," permits the district court to raise a defendant's Offense Level if the defendant played an aggravating role in the offense. *See United States v. DeCicco,* 899 F.2d 1531, 1535 (7th Cir.1990). This section provides for different Offense Levels depending on the degree of involvement in the offense and the number of participants. "The reason for distinguishing the various criminal participants' roles, and for classifying some as organizers, leaders, managers, or supervisors, is to assess punishment based on relative responsibility." *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989).

The district court enhanced Brown's sentence under Section 3B1.1(c) which provides for a two level increase if the defendant was an organizer, leader, manager, or supervisor in any criminal activity, regardless of size. Although the Guidelines provide no definitions of "organizer", "leader", "manager", or "supervisor", they do contain explanatory notes. The Commentary to § 3B1.1(c) makes it clear, particularly in relatively small criminal enterprises, that "it makes little difference if one is an organizer or leader as opposed to a mere manager or supervisor; the offense level is increased by two for all." *Herrera,* 878 F.2d at 1000 n. 1.

█ A sentencing court's determination concerning a defendant's role in the offense is a finding of fact, subject to a clearly erroneous standard of review on appeal. *Id.* 878 F.2d at 999–1000. In making this determination, judges are required to draw inferences " 'from a variety of data, including the information in the presentence report and the defendant's statements and demeanor at the sentencing hearing.' " *Id.* 878 F.2d at 1000 (quoting

---

1. The dispute over the Criminal History Category of the defendant was resolved prior to the imposition of sentence. The defendant conceded that the disputed convictions in fact existed.

*United States v. Mejia–Orosco*, 867 F.2d 216, 220 (5th Cir.1989)); *see also United States v. Daughtrey*, 874 F.2d 213, 216 (4th Cir.1989). A finding of fact is clearly erroneous only if, after reviewing all the evidence, the appellate court is left "with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. *Id.* at 574, 105 S.Ct. at 1511–12.

■ The district court concluded that Brown was an organizer and leader of the stolen check scheme because she "obtained the stolen mail, herself, and recruited her co-defendant in this case, Hassan Haaris, and others to sell the stolen mail to postal inspectors; Brown would then obtain a share of the proceeds." The evidence in the record fully supports this conclusion. The district court had evidence that Brown had the connection to the "postal inspectors", she picked the person to introduce to the inspectors, she selected the time and place of the exchange, she coached the third parties about how the exchange would transpire and what they should say, she determined the amount of payment she would receive from the check suppliers, and she received the money from the sellers after they received money from the postal inspectors. Clearly these factors are sufficient to support a finding that she was at least a supervisor in the crime.

Brown raises several challenges to the district court's findings. She first contends that the finding by the district court is not supported by the evidence, in part, because the scheme was developed by Jerry Mosley. This argument is misplaced because Guideline § 3B1.1(c) does not require the defendant to be the "creator" of the scheme; one need only be an "organizer, leader, manager or supervisor." Brown clearly carried on the plan and assumed leadership after Mosley was discovered and fired.

Brown also claims she did not recruit Haaris, rather Haaris volunteered to sell the checks and participate in the scheme. However, the district court's conclusions are supported by the record. While it is true that Haaris asked if he could sell the stolen checks, this only occurred after Brown's subtle recruiting. Brown asked Haaris to drive her to Tetter's apartment and accompany her inside. While inside Brown selected checks in front of Haaris and described the entire scheme to him. She also explained she could not sell the checks herself because she was not supposed to possess the stolen checks. After learning of this seemingly safe way to make money Haaris then asked if he could sell the checks. Brown still had final authority over whether to let Haaris sell them or not.

Finally, Brown argues that she exercised little decision-making authority, had no participation or planning in the offense, and had no authority or control over other members involved in the scheme. The record indicates the contrary. Brown participated in the offense and planned the meetings, she instructed the sellers on what to say, and arranged for all parties to be paid. While Brown had no authority over the acquisition of the stolen checks by "Little Al" and "Big Ed", she had near complete authority over the sale side of the criminal activity. It is not necessary that Brown control all aspects of the scheme to be an organizer or a leader. Indeed a "middleman who simply coordinates the purchase of drugs from sources and sells to others may be an organizer ... even if his operation can be characterized as minimally structured." *United States v. Barreto*, 871 F.2d 511, 512 (5th Cir.1989). It is enough for this increase that Brown organized or managed Haaris in the scheme.

In sum, Brown's activities reflect her leadership and organizational role in the scheme to deceive the postal inspectors. She exercised authority over the introductees, planned and participated in the exchange of stolen checks, and made possible a scheme that without her unique role as a dual agent could not be carried out. The sentencing court's finding that she was an

organizer is, therefore, not clearly erroneous.

### III.

Brown also alleges the sentencing court improperly imposed a two level increase to the Guideline level under § 3C1.1 for obstruction of justice. This enhancement was based on a finding that Brown had destroyed checks following her release from custody on the day of her arrest. Brown argues this finding is clearly erroneous and further, that her conduct, if it occurred, does not constitute obstruction under the Guidelines.

■ The sentencing court's determination that a defendant obstructed justice is also a finding of fact. Thus, our review is under a clearly erroneous standard. *United States v. Franco–Torres*, 869 F.2d 797, 800 (5th Cir.1989). Brown argues that the evidence supporting the sentencing court's finding was insufficient to support the conclusion that Brown destroyed the checks. Brown primarily relies on the conflicting testimony of White and Tetter to maintain her position. She notes that Haaris was the only witness to testify there were twelve checks, while White and Tetter had testified the numbers of checks were closer to four or five.

Under Guideline § 3C1.1, a defendant's Offense Level is increased two levels "if the defendant willfully impeded or obstructed, or attempted to impede or obstruct the administration of justice during the investigation or prosecution of the instant offense." The Commentary to this Guideline states that the provision is intended to apply to defendants who engage in conduct "calculated to mislead or deceive authorities or those involved in a judicial proceeding, or otherwise to willfully interfere with the disposition of criminal charges, in respect to the instant offense." Application note 1 to the Guidelines lists types of conduct which may provide a basis for applying the obstruction adjustment. One of the types of conduct listed is "destroying or concealing material evidence or attempting to do so."

In reaching its conclusion the district court assessed the credibility of the witnesses and concluded Haaris' testimony was more credible. "It is a well-settled law that a court of appeals does not stand in judgment of the credibility of witnesses. Rather, that question is left to the sound discretion of the trier of fact." *United States v. Zambrana*, 841 F.2d 1320, 1324 (7th Cir.1988). The trial court heard the testimony of the witnesses, observed their demeanor, and thus was in the best position to make a credibility determination. The sentencing court's conclusion is not clearly erroneous.

■ Brown alternatively argues that because the stolen checks were not part of the charged conduct, they were not related to this prosecution. She contends that because obstruction requires that a defendant's conduct be linked to the pending prosecution, the enhancement is inappropriate.

The destruction of checks by Brown, however, did constitute destruction of material evidence of the crimes with which she was charged. The indictment charged Brown and Haaris with conspiracy to possess and sell stolen checks as well as unlawfully possessing the contents of stolen mail. The conspiracy was not limited to the four checks actually sold to the postal inspectors. Therefore the possession of other checks was further evidence of the charged conspiracy and possession. Brown's destruction of those checks was directly related to this case. The two level increase was appropriate.

### IV.

For the above reasons, the district court's judgment is AFFIRMED.