**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Brian BAFIA, Michael Kerridan, John Cappas and Philip LaPorta, Defendants–Appellants.**

Nos. 89–2167, 89–2168, 89–2322, 89–2414 and 89–2561.

United States Court of Appeals, Seventh Circuit.

Argued April 5, 1991.

Decided Dec. 10, 1991.

Rehearing Denied Dec. 27, 1991 in No. 89–2167.

Rehearing Denied Jan 9, 1992 in No. 89–2561.

Rehearing Denied Jan. 29, 1992 in Nos. 89–2322, 89–2414.

---

David E. Bindi, Asst. Atty. Gen. (argued), Mark S. Prosperi, Asst. U.S. Atty., Office of the U.S. Atty., Criminal Div., Chicago, Ill., for U.S.

Jeffrey B. Steinback, Marc W. Martin (argued), Genson, Steinback & Gillespie, Chicago, Ill., for Philip LaPorta.

Jeffrey N. Cole, Chicago, Ill. (argued), for John Cappas.

Jerry B. Kurz (argued), Kathryn Hall, Hall & Kurz, Chicago, Ill., for Michael Kerridan.

Charles K. Piet and Alan S. Nagel, Grodner & Nagel, Chicago, Ill. (argued), for Brian Bafia.

Before BAUER, Chief Judge, and CUMMINGS and POSNER, Circuit Judges.

BAUER, Chief Judge.

On December 1, 1988, a federal grand jury returned a 49–count superseding indictment charging defendants-appellants John Cappas, Brian Bafia, Michael Kerridan, Philip LaPorta, and eighteen others with participating in a cocaine distribution network that operated primarily in the southwestern suburbs of Chicago from 1985 through 1988. LaPorta pleaded guilty; Cappas, Bafia, and Kerridan, however, did not—they were tried and convicted. In this consolidated appeal, Cappas, Bafia, Kerridan, and LaPorta challenge various aspects of their convictions and sentences. Because we find no merit in their claims, we affirm the convictions of all four defendants and the sentences of Bafia, Kerridan, and LaPorta. Yet, because we hold that the district court may have misread the law regarding the appropriate sentence for a continuing criminal enterprise and a conspiracy, we remand Cappas' case to the district court for resentencing.

I.

This sad tale of greed and addiction began in the spring of 1985, the year after John Cappas graduated from high school. At that time, Cappas lived with his parents in Oak Lawn, Illinois, and earned an honest income working at his father's liquor store. But the evidence at trial showed that even in 1985, Cappas had begun to supplement his income by selling cocaine. Over the next three years, Cappas grew from a small-time distributor into a kingpin and organizer of a cocaine distribution network. Cappas never used cocaine; in fact, he had a rather low opinion of those who did. Cappas had another addiction: it was his ambition to increase his volume of cocaine sales to the point where he would be able to distance himself from the actual distribution of cocaine, leaving that to his small army of distributors, and concentrate solely on the acquisition of cocaine and the collection of debts.

In the fall of 1985, Cappas left his parents' home and moved into an apartment in Justice, Illinois. This move allowed him to store his supply of cocaine and an impressive armory of firearms in his apartment. Cappas' move coincided with a significant expansion of his operation. By the end of 1986, Cappas could boast of having numerous distributors on the street selling his product in larger and larger quantities. Cappas would purchase cocaine from various suppliers. He then would dilute or "cut" the narcotic with Inositol, a white powdery vitamin compound. Cappas would sell this cocaine-Inositol mixture to his distributors on credit; the distributors would resell the narcotic to consumers, thereby earning enough money to pay their debt to Cappas and put something in their pockets. Bafia, Kerridan, and LaPorta joined the Cappas organization as distributors in 1986.

Cappas maintained control over his expanding network of distributors through the use of pagers, supplied at his expense. Each member of the network was assigned a code number. When a distributor needed cocaine, he would page Cappas, who would in turn page whoever was assigned as "Custodian" of his supply. (As his organization grew, Cappas demonstrated an aversion to handling the cocaine himself. By the end of 1986, Cappas stored his supply of cocaine in lockboxes at various locations and appointed a series of individuals "Custodians" of the stash.) Cappas also controlled his enterprise with violence or the threat of violence. The cocaine business is fueled by credit; it is not surprising that the collection of cocaine debts was a predictable and recurring problem. Cappas' solution was to recruit various individuals who would help him "persuade" drug debtors to pay their debts. Cappas' "persuaders" were known to fire shots into a debtor's home and explicitly threaten violence and death to those who refused to pay.

If Cappas' lifestyle was any measure of his entrepreneurial success, then there is no doubt that John Cappas was quite a businessman. During 1986 and 1987, Cappas purchased a home for $100,000 in Lockport, Illinois; two new Corvettes each costing over $29,000 (and both equipped with stereos and custom features totalling over $21,000); a third special edition Corvette costing over $50,000; a Rolex Presidential wristwatch for $11,600; a snowmobile and trailer costing over $5300; and for his girlfriend, a $5000 fur coat and $1900 gold and diamond necklace spelling out the words "Spoiled Brat." Also in 1987, Cappas started a business called "Flash Sweats" that sold sports apparel. For his $30,000 investment, Cappas received a 60% share of the business which turned a profit of $6568 in 1987. For 1987, Cappas reported a taxable income of $14,605. The Internal Revenue Service calculated that Cappas underreported his 1987 income by over $150,-000.

Nevertheless, by the end of 1987, the Cappas organization had begun to crumble. Federal authorities had infiltrated Cappas' network; a Special Agent of the Drug Enforcement Agency successfully posed as a cocaine purchaser to one of Cappas' distributors. (We suspect that it was not difficult to identify Cappas as a drug dealer—for instance, the license plate on his Corvette spelled "Coke." The difficulty—and the danger—lay in the collection of admissible evidence to be used against Cappas and his distributors.) On March 2, 1988, state and federal officers executed a search warrant at Cappas' house in Lockport. The officers seized numerous records of the cocaine network. One month later, Cappas' house was seized pursuant to court order.

Following several more months of investigation, Cappas and his distributors, including Bafia, Kerridan, and LaPorta, were arrested. Bafia admitted that, in 1986 and 1987, he sold five to ten ounces of drugs per week for Cappas, and that he participated in using extortionate means to collect debts for Cappas. Kerridan stated that he began buying cocaine from Cappas in 1986, and was soon distributing five ounces a month to twenty-five customers. He also admitted to participating in Cappas' plot to murder a rival drug dealer.

After a jury trial, Cappas was convicted on one count of engaging in a continuing

criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848 (1988); one count of conspiring with the other defendants to distribute and possess with the intent to distribute cocaine, in violation of 21 U.S.C. § 846 (1988); thirteen counts of distributing cocaine, in violation of 21 U.S.C. § 841(a)(1) (1988); three counts of using extortionate means to collect extensions of credit, in violation of 18 U.S.C. § 894 (1988); three counts of carrying a firearm in relation to crimes of violence and drug trafficking, in violation of 18 U.S.C. § 924(c)(1) (1988); one count of using the telephone to facilitate a drug trafficking offense, in violation of 21 U.S.C. § 843(b) (1988); and two counts of underreporting his income on his tax returns, in violation of 26 U.S.C. § 7206(1) (1988).

Bafia and Kerridan each were convicted on the conspiracy count, and on one count of using a firearm in relation to crimes of violence and drug trafficking. Bafia was also convicted on one count of extortion. LaPorta pleaded guilty to the two counts with which he was charged: the conspiracy count and attempting to collect an extension of credit by extortionate means.

Cappas was sentenced to a total of 45 years imprisonment: on the CCE count and the conspiracy count, concurrent terms of 365 months imprisonment, to run concurrently with the sentences on the remaining counts, except the firearms counts; and on the three firearms counts, consecutive terms of five years for each count. Bafia was sentenced to concurrent terms of 188 months on the conspiracy and extortion counts, and to a consecutive five year term on the firearm count. Kerridan was sentenced to 235 months on the conspiracy count, and to a consecutive five year term on the firearm count. LaPorta was sentenced to a term of 97 months on the conspiracy count, and a five year term of probation on the extortion count. All four defendants filed timely notices of appeal.

## II.

Because the defendants raise different issues on appeal, we will consider each defendant in turn.

### A. Issues Raised by Cappas

Cappas first argues that his conviction for engaging in a CCE must be reversed because the district court improperly instructed the jury on the elements of the offense, specifically, the number of conspirators required to constitute "in concert" criminal activity. Cappas maintains that the district court erred by refusing to give an instruction he tendered that would have required the jury to find that Cappas supervised five or more persons simultaneously in order to be found guilty of engaging in a CCE.

■ The refusal to give an instruction tendered by the defendant is not error if the instruction is not a correct statement of the law. *United States v. Anderson*, 798 F.2d 919, 925 (7th Cir.1986). To prove that a defendant engaged in a CCE, the government must show that the defendant (1) committed a predicate offense by violating one of certain specified drug laws (2) as part of a continuing series of drug law violations, (3) committed while acting in concert with five or more persons (4) over whom the defendant exercised managerial or supervisory control, and (5) from which the defendant obtained substantial income or resources. *United States v. Sophie*, 900 F.2d 1064, 1077 (7th Cir.1990). *See also* 21 U.S.C. § 848.

■ Cappas' argument involves the third element, the "in concert" requirement. Cappas claims that the government must prove that he managed or supervised at least five persons *at the same time*, and thus the government may not rely on evidence that five or more persons were involved at various times during the course of the enterprise. Cappas maintains that it is not sufficient to show that he supervised two or three people at one time, and then three or four different people at another time in order to sustain a CCE conviction.

Cappas' argument is without support. Every circuit that has considered the argument has rejected it. *See United States v. Jenkins*, 904 F.2d 549, 553–54 (10th Cir. 1990); *United States v. Ricks*, 882 F.2d

885, 891 (4th Cir.1989), *cert. denied,* 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990); *United States v. Fernandez,* 822 F.2d 382, 386 (3rd Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 450, 98 L.Ed.2d 391 (1987); *United States v. Boldin,* 818 F.2d 771, 775–76 (11th Cir.1987); *United States v. Lueth,* 807 F.2d 719, 731 (8th Cir.1986); *United States v. Burt,* 765 F.2d 1364, 1366 (9th Cir.1985); *United States v. Young,* 745 F.2d 733, 747 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985); *United States v. Phillips,* 664 F.2d 971, 1034 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). Closer to home, in *United States v. Bond,* 847 F.2d 1233 (7th Cir.1988), this court declared that action in concert with five persons simultaneously is not required:

> [t]he statute speaks of acting in concert with five persons; it does not say the same five continuously.... The question is whether [the defendant] acted in concert with five as manager or coordinator. It is on this question that the tenure of office of the staff is irrelevant. That [the defendant] barked orders to [one underling] on Monday and [another underling] on Tuesday, while tossing bales of marijuana to his brother on Wednesday—and that the underlings of the organization may have been here today and gone tomorrow—does not detract from the extent of [the defendant's] coordinating role.

*Id.* at 1237.

Cappas tries to twist the meaning of *Bond* to support his argument. In *Bond,* we noted that the CCE statute is intended to combat large criminal organizations, and was not intended to apply to a small-time drug dealer who uses one courier in January, a second in February, and so on, until five couriers have taken part. *Bond,* 847 F.2d at 1237. Cappas seizes on this point and argues that the government must prove simultaneous supervision of five people, none of whom are replacements for others who have left the enterprise. But such a position is not an accurate reading of *Bond.* As the excerpted language demonstrates, *Bond* dismissed as irrelevant the possibility that underlings came and went, in light of the defendant's role as manager and coordinator of a larger criminal organization.

Cappas also relies on *Jeffers v. United States,* 432 U.S. 137, 147–49 and n. 14, 97 S.Ct. 2207, 2214–15 and n. 14, 53 L.Ed.2d 168 (1977), and *United States v. Jefferson,* 714 F.2d 689, 705 (7th Cir.1983), *appeal following remand,* 760 F.2d 821 (7th Cir.), *vacated and remanded,* 474 U.S. 806, 106 S.Ct. 41, 88 L.Ed.2d 34 (1985), *on remand,* 782 F.2d 697 (7th Cir.1986). Among other things, these two cases stand for the proposition that the "in concert" requirement of § 848 requires proof of an agreement among the persons involved in the continuing criminal enterprise. Cappas maintains that this requirement implies that "the CCE defendant must supervise the five other people simultaneously at at least one point in time." Cappas' Brief at 11. Without this simultaneity, Cappas argues, there cannot exist the necessary conspiracy between the defendant and the five other persons whom he supervises.

But, again, Cappas misreads the case law. There is nothing in *Jeffers* or *Jefferson* that could be read to require simultaneity. Instead, as *Jeffers* informs us, the "in concert" element merely implies an agreement in a design or plan. *Jeffers,* 432 U.S. at 149, 97 S.Ct. at 2215. It is sufficient to prove that the CCE defendant had a conspiratorial agreement with each of the five underlings. It is not required that the five act in concert with each other. We have previously summarized the government's burden of proof on section 848:

> The government need not establish that the defendant managed five people at once, that the five acted in concert with each other, that the defendant exercised the same kind of control over each of the five, or even that the defendant had personal contact with each of the five.

*United States v. Moya–Gomez,* 860 F.2d 706, 746 (7th Cir.1988) (quoting *United States v. Possick,* 849 F.2d 332, 335–36 (8th Cir.1988)). The instruction tendered by Cappas requiring simultaneous supervision by a CCE defendant did not state the law

correctly, and the district court, therefore, properly refused it.

■ Because the district court imposed concurrent sentences for his convictions on counts one and two, the CCE and conspiracy charges, Cappas next argues that these multiple sentences, even though concurrent, violate the Double Jeopardy Clause of the Fifth Amendment. Cappas primarily relies on our opinion in *Jefferson*, where we stated:

> If § 846 [conspiracy] is a lesser-included offense of § 848 [CCE], the conviction and sentence imposed for the lesser-included offense must be vacated.... [W]e hold that § 846 is a lesser-included offense of § 848. Appellant's § 846 conviction and sentence will be vacated.

714 F.2d at 703, 705. Undoubtedly, our language here is clear. If *Jefferson* is still good law, then Cappas' § 846 conviction and sentence must be overturned.

Although the opinion has never been overruled formally, *Jefferson* simply does not govern any longer. To understand the rather confusing progression of *Jefferson* (hereinafter *"Jefferson I"*) and its subsequent history—and, we hope, to resolve once and for all (or at least until the Supreme Court directs otherwise) any confusion regarding multiple sentences under §§ 846 and 848—we shall trace the development of the law of conspiracy and CCE convictions.

Our story begins with the Supreme Court's decision in *Jeffers*, in which the Court declared that cumulative penalties for §§ 848 and 846 are prohibited by the Double Jeopardy Clause. 432 U.S. at 157, 97 S.Ct. at 2220. By "cumulative punishment," however, *Jeffers* refers to consecutive sentences—in *Jeffers*, the defendant had been sentenced to prison terms and fines on both conspiracy and CCE counts, the sentences to run consecutively. The Supreme Court determined that by making the fines consecutive, the total fine imposed exceeded the statutory maximum for either offense. Thus, the defendant was entitled to have the CCE fine reduced so that the total fine was within the maximum limits. *Id.* at 154–58, 97 S.Ct. at 2218–20.

The Court did not disturb the imposition of consecutive prison terms, however. The statutory maximum term under the CCE charge is life; consecutive sentences could not exceed that limit.

After the Court's pronouncements in *Jeffers* came our opinion in *Jefferson I*. As we have discussed, *Jefferson I* held that the Double Jeopardy Clause of the Fifth Amendment precludes convictions on both conspiracy and CCE charges. Because the district court sentenced Jefferson to concurrent penalties for the CCE and conspiracy charges, we remanded the cause for resentencing consistent with our opinion. In the appeal following remand, *see United States v. Jefferson*, 760 F.2d 821 (7th Cir. 1985) (*"Jefferson II"*), we affirmed the district court's imposition of a single sentence for the defendant's CCE conviction. That decision, however, was vacated by the Supreme Court and remanded. *See Jefferson v. United States*, 474 U.S. 806, 106 S.Ct. 41, 88 L.Ed.2d 34 (1985). The basis for the remand was the Court's recent opinion in *Garrett v. United States*, 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). There the Court held that "the language, structure and legislative history ... show in the plainest way that Congress intended ... [the CCE charge] to be a separate criminal offense...." *Id.* at 779, 105 S.Ct. at 2412. Thus, the Court affirmed Garrett's sentence which included concurrent sentences for CCE and conspiracy convictions.

Following *Garrett*, we concluded in *United States v. Jefferson*, 782 F.2d 697 (7th Cir.1986) (*"Jefferson III"*), that the sentence originally imposed by the district court—concurrent prison terms for the defendant's CCE and conspiracy convictions—was permissible. We declared

> [U]nder *Garrett*, the sentence originally imposed on Jefferson fully comports with the requirements of the Double Jeopardy Clause. It follows that the original sentence should never have been set aside. Although we are not authorized to vacate [*Jefferson I*], we conclude that that decision has been overruled by *Garrett* and no longer has force and effect.

*Id.* at 701. Apparently with this reasoning in mind (though we neglected to cite the *Jefferson* decisions explicitly), we held in *United States v. Bond*, 847 F.2d 1233 (7th Cir.1988), that

> it is not illogical to convict a person of both agreeing to do something (§ 846) and succeeding on a grand scale (§ 848).... The most that one can say is that the conspiracy is a lesser included offense of the CCE. That holding—coupled with the conclusion in *Garrett*—supports the conclusion that a court may impose concurrent sentences for a conspiracy and the CCE offense.

*Id.* at 1238–39.

Since *Bond*, we have made clear that *Jefferson I* no longer represents governing law in this circuit. *See United States v. Moya–Gomez*, 860 F.2d 706, 754 (7th Cir. 1988) ("[T]he effect of the holding in *Bond* was to overrule the court's previous holding in *Jefferson*...."); *United States v. Alvarez*, 860 F.2d 801, 830 n. 31 (7th Cir. 1988) ("[*Bond*] apparently overruled *sub silentio* that part of [*Jefferson I*] that required the vacation of both the conviction and sentence for conspiracy when the defendant was also convicted of the CCE offense."). We are left, then, with the following principle from *Jeffers* and its confusing progeny: concurrent sentences may be imposed under § 846 (conspiracy) and § 848 (CCE), provided, as *Jeffers* held, that the defendant does not receive "cumulative" penalties for these two offenses. By "cumulative" penalties, we mean that the court may not impose double punishment, *see Alvarez*, 860 F.2d at 830–31 n. 31, or, as we articulated more exactly in *Bond*, "the punishment may not exceed the maximum under the CCE act." 847 F.2d at 1239. Perhaps we most clearly explained our logic in *United States v. Pace*, 898 F.2d 1218 (7th Cir.1990):

> CCE and conspiracy, while not the same, are similar crimes. Both punish agreements to commit crimes (such as running a drug enterprise); CCE, unlike conspiracy, also punishes the agreement's success. Most important, CCE, like an ongoing conspiracy, involves continuing conduct. Thus, there is no reason not to

apply to a CCE conviction the general principle that an increased penalty may apply to a continuing crime.... [But] the district judge should keep in mind that he may not take the conspiracy conviction into account when sentencing [the defendant] on the CCE count. The judge may impose a [separate,] concurrent prison sentence for the conspiracy count.

*Id.* at 1238 (citations omitted).

In the instant case, the district court, applying the United States Sentencing Guidelines (the "Guidelines") imposed concurrent sentences of thirty years for Counts One and Two, the CCE and conspiracy convictions. Cappas, citing *Jefferson I*, argues that multiple sentences for convictions of CCE and conspiracy charges, even concurrent ones, violate the Double Jeopardy Clause. From our exposition of the case law, it is clear that Cappas' claims must fail. Cappas clings to the mere fact that *Jefferson I* was not formally overruled, and neglects to give proper weight to the subsequent history of *Jefferson I*, or to the host of more recent cases in which we have declared explicitly that that opinion no longer has force or effect. Thus, concurrent sentences for Cappas' convictions of CCE and conspiracy are indeed permissible. *See Moya–Gomez*, 860 F.2d at 754.

Nevertheless, the district court's particular application of the Guidelines requires closer examination. From the record before us, it appears that the district court essentially adopted the sentencing recommendations of the government's presentence investigation report ("PSI"). *See* Transcript of Proceeding, Cappas Sentencing ("Cappas Trans."), at 20–27. The PSI aggregated the various counts against Cappas into four different divisions: the drug counts category, two extortion categories, and the filing of false tax return category. Cappas challenges the sentence imposed on the drug counts. He claims that the district court impermissibly lumped the conspiracy sentence with Cappas' CCE sentence—in other words, that the district court stepped over the line that permits concurrent sentences for conspiracy and

CCE convictions but does not allow double punishment.

■ We agree. Given the nature of the case law, it is not surprising that the district court may have been uncertain about how exactly to impose sentence on both CCE and conspiracy convictions. Nevertheless, we are convinced that the court neglected to consider the exhortations from *Jeffers, Bond, Alvarez,* and *Pace*—cases that stand for the proposition that, although concurrent sentences are indeed permissible and, in this case, highly appropriate, conspiracy is still a lesser-included offense to CCE and, thus, Cappas should not take a bigger hit for the conspiracy than for the CCE.

■ Given that the district court grouped the conspiracy and CCE convictions into one category and then applied the Guidelines, it seems clear that the Cappas' conspiracy sentence affected the CCE sentence in clear violation of *Alvarez.* In *Alvarez,* we vacated concurrent CCE and conspiracy sentences because there existed "the distinct possibility that the district court may have considered [the defendant's] guilt on the conspiracy conviction in sentencing him on the CCE conviction." 860 F.2d at 830–31. In the instant case, the district court committed the same error.

The court determined Cappas' sentence by starting with the Guidelines' base offense level of 34, based on the quantity of drugs "proved at this trial in the course of this conspiracy and this continuing criminal enterprise...." Cappas Trans. at 13. See also Cappas Trans. at 20 ("So, base offense level, based on that quantity and based on the compilation of counts, we start at 34."). To this base figure, the court added a four

level enhancement for Cappas' "role in the offense." The court declared, "[T]here is an increase by four levels based on the fact that Mr. Cappas was the organizer and leader of criminal activities." Cappas Trans. at 23. Two more levels were added for obstruction of justice, resulting in the adjusted offense level of 40. Because there were no aggravating circumstances arising from Cappas' record of past criminal convictions, the court assigned Cappas the Criminal History Category of I. *See* Cappas Trans. at 26. This calculus—the Adjusted Offense Level of 40 and the Criminal History Category I—placed Cappas in the Guideline sentencing range of 292 to 365 months imprisonment. The district court then imposed concurrent sentences of 365 months for the CCE and conspiracy convictions.

■ Had the district court not aggregated the CCE and conspiracy convictions, the application of the Guidelines may have resulted in a different sentence. If we focus solely on the CCE charge, Cappas' base offense level would be 32.[1] Such a base level in Criminal History Category I dictates a sentencing range of 121 to 151 months. If we add the two level increase for obstruction of justice, raising Cappas' offense level to 34, the sentencing range becomes 151 to 188 months—still a far cry from the 365 months actually imposed for the CCE charge. We note that under § 2D1.5 of the Guidelines, the district court is prohibited expressly from enhancing the CCE adjusted offense level for Cappas' "role in the offense," because the substance of the CCE offense embraces the notion that the defendant supervised a large-scale criminal operation.

The government does not dispute that Cappas received a far longer sentence than

---

1. The relevant portion of the Guidelines for CCE convictions is Section 2D1.5. This section has been amended significantly in the past three years, once in October 1988, and then again in November 1989. *See* Guidelines, Appendix C, amendments 66, 139 at C.35, C.82. Nevertheless, these amendments need not concern us because the version of Guidelines utilized to compute Cappas' offense levels were those in effect at the time of his infractions. *See* Government's Response to Cappas' Objections to

PSI, Record Document 372 at 5. Although the general rule provided by statute is that the defendant is to be sentenced under the guidelines "in effect on the date the defendant is sentenced," 18 U.S.C. § 3553(a)(4) (1988), in this case the application of the amended guidelines, at least for the CCE conviction, would have resulted in Cappas receiving a higher base offense level. *See United States v. Scott,* 914 F.2d 959, 961 n. 4 (7th Cir.1990).

that permitted by the Guidelines for the CCE offense. Its sole response is that this increase is permitted by *Bond* because the sentence Cappas received for the CCE and conspiracy convictions was less than the statutory maximum of life imprisonment. Yet, the government's argument neglects a key distinction. *Bond* was a non-Guidelines case in which the maximum permissible sentence under a CCE conviction was life imprisonment. It is not surprising that *Bond* spoke only of statutory maxima. *Bond* did not suggest that in a Guidelines case, the permissibility of a given penalty for CCE is to be determined by whether it exceeds life imprisonment. This case is governed by the Guidelines which, as the Court declared in *Mistretta v. United States*, 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), are a "mandatory" system that "bind[s] judges and courts in the exercise of their uncontested responsibility to pass sentence in criminal cases." *Id.* at 367, 368–69, 391, 109 S.Ct. at 652, 652–53, 664. As Justice Scalia stated, "While the products of the Sentencing Commission have been given the modest name 'Guidelines,' they have the force and effect of laws, prescribing the sentences criminal defendants are to receive. A judge who disregards them will be reversed." *Id.* at 413, 109 S.Ct. at 676 (dissenting opinion).

By imposing concurrent 365–month sentences for CCE and conspiracy, the district court impermissibly considered Cappas' conspiracy conviction when sentencing him for the CCE conviction. Put simply, Cappas' sentences for CCE and conspiracy exceed the allowable limit established by law. (We note that where the amount of narcotics involved in the CCE exceeds a prescribed level, § 2D1.5(a)(3) of the Guidelines mandates life imprisonment. The amount of drugs involved in the Cappas CCE did not approach that level and, thus, life imprisonment is not the appropriate yardstick by which to measure the permissibility of Cappas' sentence.) Therefore, we vacate Cappas' sentence and remand the cause to the district court for resentencing. On remand, we know that the district court will give careful consideration to both the CCE and conspiracy convictions, keeping in mind that concurrent punishment for CCE and conspiracy is not prohibited so long as that punishment does not exceed that which is authorized for the greater CCE offense.

Cappas' remaining claims on appeal deserve far less attention. Count Twenty-Nine alleged that, on October 17, 1987, Cappas carried a firearm during, and in relation to, a drug trafficking offense, namely, conspiracy to distribute and possess with intent to distribute cocaine, in violation of 18 U.S.C. § 924(c)(1). He argues that the evidence was insufficient to support the guilty verdict on that count because it showed only that Cappas had the gun with him when he went to make a payment to one of his sources, and did not show that he used the gun "in relation to" a drug trafficking offense. Cappas also claims that the district court's instruction on count twenty-nine was inadequate to inform the jury of the evidence necessary to satisfy the "in relation to" requirement. Neither claim has merit.

■ In challenging the sufficiency of the evidence that supports the verdict, Cappas carries a heavy burden. The evidence will be viewed in the light most favorable to the government, and the conviction must be affirmed if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). *See also United States v. Muehlbauer*, 892 F.2d 664, 667 (7th Cir.1990).

■ Viewing the evidence in this light, it is clear that Cappas cannot satisfy his burden. All that is required to support a conviction under § 924(c)(1) is that the defendant be shown to have possessed or had control of a firearm during the commission of the underlying crime, and that "the circumstances of the case show that the firearm facilitated or had a role in the crime, such as emboldening an actor who had the opportunity to display or discharge the weapon to protect himself or intimidate others...." *United States v. Vasquez*, 909 F.2d 235, 239 (7th Cir.1990) (quoting

*United States v. Stewart,* 779 F.2d 538, 540 (9th Cir.1985)), *cert. denied,* 484 U.S. 867, 108 S.Ct. 192, 98 L.Ed.2d 144 (1987).

 Although § 924(c)(1) does not apply to the defendant who fortuitously has a gun when he commits an entirely unrelated crime, it does apply when the trier of fact reasonably could conclude that the defendant had the gun to protect drugs or money in his possession, whether or not there was an immediate likelihood of danger. *See Vasquez,* 909 F.2d at 240 ("It was certainly logical for the trial judge to conclude that under the circumstances Vasquez had an evident need for weaponry that was readily available in the event a covetous competitor or a group of government agents arrived to appropriate his hoard."). *See also United States v. La-Guardia,* 774 F.2d 317, 321 (8th Cir.1985) (weapon had "undoubted utility in the protection of the valuable supply and of the cash on hand").

 We hold that the jury reasonably could conclude that the nine-millimeter pistol that Cappas carried in his gym bag when he went to pay one of his suppliers indeed was used "in relation to" drug trafficking. The evidence established that, on October 17, 1987, Cappas brought the gym bag, containing the gun, with him into his apartment where he counted out $10,000 in cash. When he left the apartment, Cappas again took the gun with him as he and one of his distributors drove to meet the supplier in order to deliver the cash. This kind of behavior demonstrates both Cappas' appreciation of the unforeseen ways that danger can confront a drug dealer and his desire to have a gun handy at all times to protect himself and his hoard of cash or drugs. The evidence, then, is sufficient to support the verdict.

 As far as the district court's instruction is concerned, we note simply that the given instruction tracked the statutory language and required the jury to find that "defendant John Cappas carried a firearm during and in relation to the offense charged in Count II." Transcript of Proceeding at Trial ("Trial Trans.") at 3731.

This instruction is adequate to inform the jury that it must find a relationship between the gun and the underlying drug offense. *United States v. Malin,* 908 F.2d 163, 167 (7th Cir.1990). An instruction explaining the "in relation to" element may be given if the defendant asks for it, but it is not required. *Id.* at 167–68. "The phrase 'in relation to' speaks for itself; any further explanation is superfluous." *Id.* at 168. In the instant case, Cappas neither objected to the instruction as given, nor tendered an explanatory instruction further describing the "in relation to" element in greater detail. We hold that the district court's instruction was proper.

 We summarily dispose of Cappas' remaining claims. Cappas argues that applying the Guidelines to continuing offenses that straddle the effective date violates the Ex Post Facto Clause of Article I, Sections 9, 10. That argument has been rejected by this court, and every other circuit that has decided the question. *See United States v. Fazio,* 914 F.2d 950, 958–59 and n. 14 (7th Cir.1990) (collecting cases). Cappas also claims that the district court erred by enhancing his offense level for obstruction of justice, and refusing to adjust his offense level for acceptance of responsibility. We offer two responses: first, Cappas has waived these claims by failing to object either to the probation officer's recommendation or to the district court's finding at the sentencing hearing (*see United States v. Pritchett,* 898 F.2d 130, 131 (11th Cir.1990)); and second, there was ample evidence to support the district court's findings, which are reviewed under the "clearly erroneous" standard. *See United States v. Brown,* 900 F.2d 1098, 1101 (7th Cir.1990). We note that the adjustment for acceptance of responsibility cannot apply when there also has been an adjustment for obstruction of justice, unless there are extraordinary circumstances. *See* Guideline 3E1.1, Application Note 4. *See also United States v. Reynolds,* 900 F.2d 1000, 1005 (7th Cir.1990). No such circumstances exist in this case. Finally, we note that the Guidelines do not, as Cappas argues, violate due process. *See United States v. Pinto,* 875 F.2d 143 (7th

Cir.1989). Any remaining claims offered by Cappas simply are without merit.

## B. Issues Raised by Bafia

Bafia makes four claims on appeal: (1) that he committed no acts in furtherance of the conspiracy after November 1, 1987 (the effective date of the Guidelines), and, thus, was not subject to sentencing under the Guidelines; (2) that his convictions for using extortionate means to collect debts and for using a weapon in committing a crime of violence violate the Double Jeopardy Clause; (3) that he was deprived of due process because his sentence was based on quantities of cocaine that were not proven at trial; and (4) that the district court erred by enhancing his offense level for obstruction of justice. None of these claims leads us to reverse the district court.

Bafia argues that there were two conspiracies: the Cappas conspiracy that was charged in the indictment, and an uncharged conspiracy involving transactions between Bafia and a cocaine buyer named Edgar Rosa. Bafia contends that the only act with which he is charged that occurred *after* the effective date of the Guidelines concerned the uncharged conspiracy with Rosa. Thus, Bafia argues, the acts committed by him that did involve the Cappas conspiracy which were charged in Count Three of the indictment occurred before the Guidelines went into effect. *See* Bafia Brief at 18. In the alternative, Bafia urges us to hold that he withdrew from the charged (i.e. Cappas) conspiracy in the summer of 1987 after he wrecked one of Cappas' corvettes and, as a result, had "a falling out" with Cappas.

We are not persuaded. There was ample evidence to show that Cappas was the source of the cocaine advanced on credit to Rosa by Bafia. Thus, Bafia's efforts to collect money from Rosa, which continued into 1988 *after* the Guidelines became effective, were part of the charged conspiracy. The evidence showed that Rosa began buying from Bafia in the summer of 1986. Rosa's last purchase took place in October 1986. The purchase involved one ounce of cocaine, at a price of $1500, which Rosa took on credit. Bafia made numerous attempts to collect on Rosa's debt. These collection efforts lasted until the spring of 1988. As we noted when considering Cappas' claims, this court, in accord with every other circuit that has decided the issue, has held that where a conspiracy began prior to the effective date of the Guidelines but continued beyond it, the Guidelines apply. *See Fazio,* 914 F.2d at 958–59 and n. 14.

Moreover, it is equally well-settled that a member of a conspiracy is liable for the acts of his co-conspirators committed in furtherance of the conspiracy. *See United States v. Andrus,* 775 F.2d 825, 850 (7th Cir.1985). In the instant case, Count Two alleged that the conspiracy began in 1985 and did not end until 1988. Even assuming that Bafia committed no acts in furtherance of the conspiracy after November 1, 1987, he was still a member of the conspiracy in 1988 and liable for the acts of his co-conspirators, that is, unless he withdrew from the conspiracy prior to the effective date of the Guidelines. Absent such a withdrawal, the Guidelines appropriately were applied to Bafia.

Yet, that he withdrew from the conspiracy is Bafia's alternative argument. He relies on two points: the evidence that he and Cappas experienced a change in their relationship as a result of Bafia's demolition of Cappas' Corvette in the summer of 1987, and the lack of any evidence that Cappas delivered cocaine to Bafia after the car crash. It is not, however, all that easy to withdraw from a conspiracy. Withdrawal requires an affirmative act to either defeat or disavow the purposes of the conspiracy, such as making a full confession to the authorities or communicating to co-conspirators that one has abandoned the enterprise. *United States v. Patel,* 879 F.2d 292, 294 (7th Cir.1989). Merely ceasing participation in the conspiracy, even for extended periods, is not enough. *Id.* Even assuming Bafia's collection efforts in 1988 served an uncharged conspiracy and that he stopped selling cocaine after the car crash in the summer of 1987, these actions are still not sufficient to constitute withdrawal. We are not persuaded by Bafia's

claims that his relationship with Cappas had so deteriorated as a result of the car crash that his involvement in the conspiracy had come to an end. The evidence showed that before Bafia wrecked the Corvette, he and Cappas were very close, but that after the crash, they were no longer "on good terms." Trial Trans. at 2830–31, 3348. There is simply no evidence of any affirmative act by Bafia that would communicate to Cappas or anyone else that he had renounced the goals of the conspiracy.

Bafia also argues that, even if he committed acts in furtherance of the conspiracy after November 1987, the Guidelines still should not apply because the bulk of his conduct occurred before the effective date. He relies on *United States v. Davis*, 718 F.Supp. 8, 10 (S.D.N.Y.1989), in which the district court refused to apply the Guidelines because the vast majority of the defendant's conduct occurred prior to November 1987. The rationale for *Davis* eludes us, nor are we bound by its result. In sharp contrast to *Davis* stands our decision in *Fazio* in which we considered—and rejected—both statutory and constitutional arguments against applying the Guidelines to a conspiracy that straddles the effective date. *See Fazio*, 914 F.2d at 958–59. Bafia offers meager justification why this court should revisit its reasoning in *Fazio*. Thus, we hold that the district court appropriately applied the Guidelines in sentencing Bafia on the conspiracy conviction.

■ Bafia's second argument urges us to reverse his convictions for extortion and firearm violations. Bafia claims that trying him for both these offenses violates the Double Jeopardy Clause's prohibition against multiple prosecutions for the same offense. Again, we are not persuaded. Bafia's argument overlooks the full implications of the dual sovereignty doctrine which instructs us that prosecution by both state and federal authorities for the same conduct does not violate either the Double Jeopardy Clause or the Due Process Clause. *Abbate v. United States*, 359 U.S. 187, 193–96, 79 S.Ct. 666, 669–71, 3 L.Ed.2d 729 (1959).

Bafia was arrested by Palos Heights, Illinois police officers shortly after he and other Cappas "persuaders" shot at the home and through the windows of one of the conspiracy's debtors. Bafia ultimately pleaded guilty in state court to a charge of criminal damage to property. His participation in that incident formed the basis of his conviction in this case on Counts Eleven and Twelve, which charged extortion and the use of a firearm in relation to crimes of violence and drug trafficking. It is this double prosecution—first his conviction in state court for criminal damage to property and then his conviction in the district court on Counts Eleven and Twelve—that Bafia contends violate his rights under the Fifth Amendment.

Bafia argues that the recent decision in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), heralds the demise of the dual sovereignty doctrine, even though *Grady* involved successive prosecutions by the same state and nowhere mentions dual sovereignty. In *Grady*, the defendant caused an automobile accident in which one person was killed and another was injured. The defendant was ticketed for two misdemeanors, driving under the influence of alcohol and failing to keep right of the median. He pleaded guilty to these charges and subsequently was indicted on several felony charges, including criminally negligent homicide. The Court held that the Double Jeopardy Clause bars subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government must prove conduct that constitutes an offense for which the defendant already has been prosecuted. *Id.* 110 S.Ct. at 2093.

Bafia argues that the dual sovereignty doctrine should be re-examined because the rationale of *Grady* can be applied to successive state and federal prosecutions just as well as to successive prosecutions by the same sovereignty. *See* Bafia Brief at 26–27. We disagree. The dual sovereignty doctrine has been a fixture of constitutional law for decades, *see United States v. Lanza*, 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922), and was once described by Justice Holmes as "too plain to need more

than statement." *Westfall v. United States,* 274 U.S. 256, 258, 47 S.Ct. 629, 629, 71 L.Ed. 1036 (1927). The concerns that underlie the dual sovereignty doctrine are different from those that support *Grady.* Multiple prosecutions by the same sovereign for the same offense are inherently unjust, not only because they subject the defendant to anxiety and uncertainty, but also because they allow the state an opportunity to rehearse its presentation of proof, increasing the risk of an erroneous conviction. *Grady,* 110 S.Ct. at 2091–92.

The doctrine of dual sovereignty, however, recognizes that the federal government and each of the states derive their power from different sources, and that the same conduct may affect the interests of each sovereign. *Heath v. Alabama,* 474 U.S. 82, 88–91, 106 S.Ct. 433, 437–439, 88 L.Ed.2d 387 (1985). As the Court explained in *Heath,* "[W]hen the same act transgresses the laws of two sovereigns, 'it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punished.' " *Id.* at 88, 106 S.Ct. at 437 (quoting *Moore v. Illinois,* 14 How. 13, 20, 14 L.Ed. 306 (1852)). There is no dispute that the State of Illinois and the federal government represent different sovereignties. *See id.* at 89, 106 S.Ct. at 437 ("[T]he Court has uniformly held that the States are separate sovereigns with respect to the Federal Government because each State's power to prosecute is derived from its own inherent sovereignty, not from the federal government." (quotations omitted)). That Illinois and the federal government may prosecute and convict Bafia for essentially the same conduct is no affront to the Fifth Amendment.

We can dismiss Bafia's remaining arguments rather easily. Bafia claims that the district court made two erroneous findings regarding the conspiracy count during the sentencing hearing: that Bafia possessed with intent to distribute 5,386.5 grams of cocaine over the course of the conspiracy (determining the defendant's sentencing range under the Guidelines); and that Ba-

fia committed perjury when he testified at trial (supporting a two level increase in the defendant's offense level for obstruction of justice). Both of these determinations by the district court are findings of -fact, which must be affirmed unless clearly erroneous. *See United States v. Ross,* 905 F.2d 1050, 1054 (7th Cir.1990); *Brown,* 900 F.2d at 1103.

■■■ Both findings by the district court are supported amply by the record. The district court essentially arrived at the 5,386.5 gram figure by multiplying the lowest estimate of the weekly amount of cocaine Bafia admitted to receiving (five ounces per week) by the number of weeks Bafia acted as a distributor for Cappas. *See* Transcript of Proceedings for Bafia Sentencing at 21–23. Bafia's admission was corroborated by several other distributors and by the large amounts of money Bafia owed Cappas. Surely it was not clearly erroneous to find that Bafia received slightly over five kilos of cocaine.

■■■ Similarly, the record strongly supports the district court's finding that Bafia obstructed justice, and thus deserved the two level increase in his adjusted offense level. Testifying untruthfully at trial represents conduct that may be the basis for the two level increase. *See* Guideline 3C1.1, Application Note 1. At trial, Bafia testified that, among other things, he never received or sold cocaine. Given the verdict of the jury, the district court could only find that Bafia lied. Thus, it was not clearly erroneous to find that he obstructed justice, thereby warranting the two level increase.

C. Issues Raised by Kerridan and LaPorta

Kerridan and LaPorta each essentially raise four issues, none of which persuade us to reverse their convictions or sentences. Kerridan challenges the evidence supporting the verdict on the conspiracy count and two findings of fact made by the district court at the defendant's sentencing hearing. Specifically, Kerridan argues that there were a series of narrower conspiracies rather than the one, all-encompassing

conspiracy found by the jury, and that the district court erred by enhancing his offense level for his "role in the offense," *see* Guideline 3B1.1(b), and by finding that he possessed with the intent to distribute 5806.65 grams of cocaine. Suffice it to say that these challenges cannot overcome the substantial deference given to the jury and the district court on factual findings. *See United States v. Paiz*, 905 F.2d 1014, 1019 (7th Cir.1990) ("[T]he jury gets first crack at deciding whether there is one conspiracy or several.... [On review,] the question for us simply is whether the evidence is sufficient to support the jury's determination." (quotations omitted)); *Brown*, 900 F.2d at 1101 ("A sentencing court's determination concerning a defendant's role in the offense is a finding of fact, subject to a clearly erroneous standard of review on appeal."); *United States v. Ross*, 905 F.2d 1050, 1054 (7th Cir.1990) ("[T]he quantity of a controlled substance involved in a cocaine transaction is a sentencing determination to be made by the sentencing judge.... [T]hus our standard of review is one of clear error."). Given the strong evidence in the record supporting the jury's and the district court's determinations, we find no error.

Kerridan also argues that his sentence on Count 28 for using a firearm during and in relation to crimes of violence and drug trafficking, *see* 18 U.S.C. § 924(c), violates the Ex Post Facto Clause, because the statutory amendment that provides for the imposed sentence did not take effect until after the charged conduct had taken place. Based on his involvement in a plot to murder one of Cappas' rivals, the district court sentenced Kerridan to a consecutive five-year prison term authorized by the current version of § 924(c). Prior to the amendment included in Chapter X of the Comprehensive Crime Control Act of 1984 (the "Act"), Pub.L. 98–473, § 1005(a), 98 Stat. 2138, the penalty was a consecutive term of imprisonment of not less than one year nor more than ten. Because § 235 provides that the ostensible effective date for the Act was November 1, 1987, and because the murder plot took place in October 1987,

Kerridan claims that the sentencing amendment should not have been applied.

The flaw in Kerridan's argument is that the effective date provision of § 235 is limited expressly to Chapter II of the Act. The relevant amendment is contained in Chapter X. In the absence of an explicit effective date provision, an act becomes effective on the date it is signed into law. *United States v. Cirrincione*, 600 F.Supp. 1436, 1438 (N.D.Ill.), *aff'd*, 780 F.2d 620 (7th Cir.1985). The Fifth and Eighth Circuits have held that the effective date provision of the Act does not apply to the amendment to § 924(c), and that the amendment became effective when signed by the President on October 12, 1984. *See United States v. Holloway*, 905 F.2d 893, 895 (5th Cir.1990); *United States v. York*, 830 F.2d 885, 892 (8th Cir.1987). Because the murder plot occurred well after that date, the amendment to § 924(c) properly was applied to Kerridan's conduct. His sentence on Count 28 is affirmed.

LaPorta similarly offers meritless claims, most of which we have already resolved. LaPorta's most significant argument is that the Guidelines should not have been used to calculate his sentence because he withdrew from the conspiracy prior to November 1, 1987, the Guidelines' effective date. We note that withdrawal from a conspiracy is a question of fact, which was found by the district court (LaPorta pleaded guilty), and, therefore, is not reversible unless it is clearly erroneous. *United States v. Wilkens*, 659 F.2d 769, 775 (7th Cir.), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981). Also, when we review the evidence to determine if the district court erred, we must view the record in the light most favorable to the government. *United States v. Mealy*, 851 F.2d 890, 895 (7th Cir.1988).

As we discussed when we resolved Bafia's claims, it is not easy to withdraw from a conspiracy. *See supra* at 1477. "To establish that he withdrew from a conspiracy, the defendant must prove that he undertook affirmative steps, inconsistent with the objects of the conspiracy, to disavow or to defeat the conspiratorial objectives, *and*

either communicated those acts in a manner reasonably calculated to reach his co-conspirators or disclosed the illegal scheme to law enforcement authorities." *United States v. Finestone*, 816 F.2d 583, 589 (11th Cir.1987). Although LaPorta claimed that he achieved withdrawal by informing Cappas that he no longer wished to participate, the district court was entitled to disbelieve that testimony and instead rely on the testimony of another cocaine purchaser and federal undercover agents who described events demonstrating Kerridan's involvement in the Cappas conspiracy well beyond the date of his alleged withdrawal. Simply put, the district court found that Kerridan did not meet his burden of proving withdrawal. We can see no error in that determination. The remaining claims of LaPorta and Kerridan are similarly without merit.

### III.

For the foregoing reasons, we affirm the convictions of Cappas, Bafia, Kerridan, and LaPorta, as entered by the district court. Likewise, the sentences of Bafia, Kerridan, LaPorta also are affirmed. Based on the grounds annunciated above, however, we vacate Cappas' sentence and remand the case to the district court for re-sentencing consistent with this opinion.

POSNER, Circuit Judge, concurring and dissenting.

To be convicted of being a drug kingpin, defendant Cappas had to be found to have supervised five or more persons. Not any five persons, though. The court notes that the kingpin statute does not "apply to a small-time drug dealer who uses one courier in January, a second in February, and so on, until five couriers have taken part." That would be a two-man operation, not a six-man one. *United States v. Bond*, 847 F.2d 1233, 1237 (7th Cir.1988). The five underling slots needn't all be occupied at the same time, however, so Cappas is wrong to argue that the kingpin must supervise all five underlings at once. Suppose the kingpin presided over a drug ring that employed underlings A, B, and C to manufacture the drug and D, E, and F to distribute it. And suppose that during the manufacturing phase D and E were on layoff, so that the kingpin was supervising only four persons, while during distribution A and B were on layoff, so that again the kingpin was supervising only four persons. It would still be a six-man, not a four-man, operation, and the kingpin statute would apply.

So far so good, but my colleagues go on to say that it is "irrelevant that underlings came and went," and that it is "sufficient that the [kingpin] had a conspiratorial agreement with each of the five underlings"—and in the setting of this case these statements are misleading. That underlings come and go is irrelevant if there are more than five slots, and on that assumption the relation among the underlings is also irrelevant. But if the question is how many slots there are, it becomes crucial whether the underlings are merely replacements for the second fiddle in the two-man band or whether they fill out a table of organization that, however informal, has at least five spaces on it.

The only way to reconcile the principle that mere replacements can't get you up to five and the principle that simultaneous supervision of all five is not required is to insist that the defendant's criminal organization have five or more positions, whether or not they're all filled at any particular moment. The focus on positions is consistent with, indeed I think required by, the court's observation that the kingpin statute "is intended to combat large criminal organizations." A two-man band is not a large organization no matter how many times the second player is replaced. A six-man band is a large organization within the sense of the statute even if not all six players are playing at once. I assume that if through electronic wizardry two players can play all six instruments at once it's still not a six-piece band within the meaning of the statute but that is not an issue here.

Cappas asked that the jury be instructed that "in deciding whether or not 5 persons were acting in concert you may not consider those persons who merely replaced oth-

ers." He cited *Bond* as the authority for this instruction. The district judge refused to give it or anything like it. This refusal was error, especially since, by (correctly) instructing the jury that Cappas need not have supervised five or persons all at once, the judge led the jury away from the replacement issue. Not only was the refusal to instruct the jury on replacements an error in light of *Bond;* it was prejudicial error. The government's case on the kingpin charge was weak. The evidence suggested that there may not have been more than four slots in Cappas's organization—and if so, it's irrelevant that because of turnover the total number of people occupying these slots exceeded four.

I agree with the rest of the majority opinion but I would reverse Cappas's conviction of the kingpin offense and remand with directions for a new trial.