**UNITED STATES, Appellee,**

v.

**William CLOUTIER, Defendant, Appellant.**

**No. 91–1435.**

United States Court of Appeals, First Circuit.

Heard March 4, 1992.

Decided June 9, 1992.

Daniel S. Tarlow with whom Richard D. Glovsky and Glovsky & Associates, Boston, Mass., were on brief for appellant.

Michael Kendall, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief for appellee.

Before TORRUELLA, Circuit Judge, CAMPBELL and BOWNES, Senior Circuit Judges.

BOWNES, Senior Circuit Judge.

The defendant-appellant, William Cloutier, pled guilty to conspiracy to possess with intent to distribute marijuana and cocaine, in violation of 21 U.S.C. § 846, and engaging in a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848.

The district court sentenced Cloutier under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). It merged the two convictions into one and applied the higher base offense level to determine the sentence. Cloutier appeals the court's sentencing procedure. He raises essentially three contentions: 1) the court's use of the Guidelines in sentencing him violates the *ex post facto* clause, contained in Article I, Section 9 of the Constitution; 2) the court's merger of the two counts for sentencing purposes violates the double jeopardy clause of the Fifth Amendment; and 3) the court does not have discretion to determine which conviction to vacate for sentencing purposes.

We find that the Guidelines should not have been used at all.

## FACTUAL BACKGROUND

Because defendant's convictions resulted from his guilty pleas, we glean the facts of the case from the uncontested portions of the presentence investigation report and the transcript of the sentencing hearing. *See United States v. Dietz,* 950 F.2d 50, 51 (1st Cir.1991). We present the facts in five installments based on time periods and the key players involved.

### 1979–1981 Lionel Laliberte/William Cloutier

During the mid to late 1970's, Cloutier was a carpenter in the Lowell, Massachusetts area. In 1974, he began selling small quantities of marijuana (ounces and one-half ounces). By 1979, Cloutier had formed two overlapping partnerships, one to buy and sell marijuana and the other to launder the proceeds from the marijuana venture into legitimate businesses. The drug partnership was formed between Cloutier and Lionel Laliberte, an unindicted co-conspirator, and lasted until 1981. Cloutier formed the money laundering business with Paul McCann, his previously legitimate carpentry-construction partner. The two invested hundreds of thousands of dollars of Cloutier's drug proceeds in real estate projects, a woodworking business

known as Heritage Wood Creations ("HWC"), and a construction business known as Heritage Custom Builders ("HCB").

During 1979 to 1981, Laliberte and Cloutier purchased marijuana primarily from Florida. This marijuana was transported by other people, including Michael Brady, James Culpepper, Norman and Ray Rice. The amount of marijuana transported on each trip generally varied from one hundred to four hundred pounds. On two occasions, a pick-up truck was used to carry seven hundred pounds of marijuana from Florida to Lowell, Massachusetts. On all other occasions, a single automobile was used.

After the marijuana was delivered to Lowell, Cloutier and Laliberte would sell it to a network of distributors. Michael Brady, a witness for the government, testified that from 1979–81 the partnership brought to Lowell about 24,800 pounds of marijuana in sixty-two trips.

### 1981–1984 Michael Brady/William Cloutier

In 1981, Laliberte left the drug partnership, which by that time included Brady. Cloutier and Brady continued selling marijuana on a smaller scale. Shortly prior to Laliberte's leaving the partnership, the three had purchased one-half pound of cocaine. Brady testified that he flew to Florida to purchase the cocaine and flew back with it to Boston. Brady testified that the next cocaine purchase was made by Cloutier and himself a year or more later. At that time, the new partnership shifted their focus from marijuana to cocaine.

Brady testified that between October 1983 to 1984, the partnership purchased approximately one pound to one kilogram of cocaine per month; and between 1982 and November 1984, it purchased a total of fifteen to twenty kilograms of cocaine. Around this time, Charles Bernier, a government witness, began working for the Brady/Cloutier partnership as a drug courier and cocaine processor.

Between 1983–84, Cloutier and McCann laundered over $112,000 of drug proceeds into HWC by disguising the money as "shareholder loans" to the company. Brady testified that he terminated his partnership with Cloutier in 1984 due to a "personality conflict" between them.

### 1984–1986 Charles Bernier/William Cloutier

After Brady left the partnership, Cloutier made Bernier a partner in the cocaine venture. From early 1985 to January 1986, Bernier made approximately twenty-four trips to Florida and one to New Jersey to buy more than thirty kilograms of cocaine for the Cloutier–Bernier partnership. Bernier broke with Cloutier in the late summer of 1986. The last drug contact that the two had occurred in late 1986 when Cloutier gave Bernier fourteen ounces of marijuana as payment toward a drug debt.

### 1986–1987 Harry Auch and Peter Richards/William Cloutier

After Bernier left the partnership, Harold Auch and Peter Richards [1] joined Cloutier in the drug business. This partnership terminated when Auch was arrested in January 1987.

Brady testified that in late 1985 or early 1986, he reconciled with Cloutier, with the intention of helping him with his drug problem. Brady testified that he had no recollection of Cloutier dealing marijuana in 1986 and 1987. It is undisputed that Cloutier stopped dealing cocaine in mid–1987, three to five months before he entered a detoxification program in October 1987. Shortly before then, Brady had offered Cloutier half the profits from a cocaine sale that Brady had made to one of Cloutier's old customers. Cloutier turned down the drug money, stating that he had made a deal with God that he would never sell drugs again.

McCann remained active in the money laundering partnership with Cloutier until 1987 when they started to divide up their commonly held assets.

---

**1.** Richards was indicted on the conspiracy count, pled guilty, and was sentenced by the court, in the same proceedings with Cloutier, to an imprisonment term of ninety-nine months.

*1988–1989 Michael Brady/William Cloutier*

Brady testified that he and Cloutier were involved between 1988 and 1989 in small scale marijuana sales. Unlike his testimony about earlier events, there was no corroboration in the form of documents, reports, or other witnesses. Brady testified that in 1988, he had given Cloutier six to nine pounds of "bad pot" on credit. On September 2, 1988, the New Hampshire police raided Cloutier's house, but did not find the pot because it was stored at the HWC factory. Brady testified that after the raid, Cloutier sold the pot and paid Brady.

Brady testified that he and Cloutier would purchase single pound quantities of marijuana from Claude Marquis, who resided in Lawrence, Massachusetts, and then sell them as ounce quantities.[2] Brady testified that he stopped selling marijuana with Cloutier in March 1989 when the government seized Brady's home as part of a drug forfeiture action. Cloutier sold Brady one or two ounces of marijuana after March 1989. Cloutier and Brady brought marijuana for their own personal use and Cloutier supplemented his income with one-ounce sales of marijuana.

In March 1988, McCann assigned his interests in HWC to Cloutier. This marked the breakup of their money laundering partnership.

## THE SENTENCING

On May 16, 1991, Cloutier was indicted for conspiracy to possess with intent to distribute marijuana and cocaine and engaging in a CCE. On October 10, 1990, Cloutier pled guilty to the conspiracy and CCE counts. Cloutier later filed a motion to withdraw his guilty plea to the CCE count, which the court denied.

The court made the following factual findings:

    a. the conspiracy and CCE continued until March 1989.

    b. the amount of marijuana involved was 24,800 pounds.

    c. the amount of cocaine involved was forty kilograms.

    d. Cloutier possessed a gun during the commission of the offense.

    e. Cloutier was the organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.

    f. Cloutier had accepted responsibility for his crimes.

Based on these findings, the court determined that the base offense level on the conspiracy count was 40, with a guideline range of 292–365 months. The court set the base offense level for the CCE count at 36 and found that Cloutier was subject to the November 18, 1988 amendment to 21 U.S.C. § 848, which increased the minimum mandatory sentence from ten to twenty years. The court imposed concurrent sentences of 235 months imprisonment for the conspiracy count and 240 months imprisonment for the CCE count.

The government moved for reconsideration of the sentence, asserting that the court should have grouped the two counts together under U.S.S.G. § 3D1.2(d) and applied the offense guideline that produced the higher offense level; this being the conspiracy count with a base offense level of 40. The court agreed with the government and merged the conspiracy and CCE sentences into one, so that there were two convictions and one sentence for the two counts. The court sentenced Cloutier on the CCE count to 292 months of imprisonment, 60 months of supervised release, and a $50 special assessment.

On April 3, 1991, Cloutier filed this appeal.

## DISCUSSION

### I. TERMINATION DATE

We must first determine whether the district court erred in finding that Cloutier's drug activities, for purposes of the

---

**2.** Brady recalled only one specific incident after 1987 when Cloutier sold marijuana. He testified that he saw Cloutier in March 1989 sell an ounce or two of marijuana to a baker in Lowell, Massachusetts.

conspiracy and CCE counts, did not terminate until March 1989. We apply the clearly erroneous standard of review. *See United States v. Bradley,* 917 F.2d 601, 605 (1st Cir.1990); *United States v. Ruiz,* 905 F.2d 499, 507 (1st Cir.1990).

Cloutier bases his challenge to the district court's finding of the termination date of his drug activities on two contentions. First, he claims that his drug activity did not continue past November 1987. Second, Cloutier contends that even if his drug activity continued past November 1987, it was part of a separate and distinct conspiracy, and not part of the charged conspiracy and CCE. Cloutier, therefore, argues that the court violated the *ex post facto* clause in sentencing him under the Guidelines, which were not enacted until November 1, 1987.

■ In addressing Cloutier's denial of any drug activity after November 1987, we find that the evidence, presented in the form of Brady's testimony, showed that Cloutier's drug activities continued after November 1, 1987. Although Brady's testimony was unsupported by corroborating evidence and was, at times, confused and inconsistent, the court as the trier of fact had the opportunity to observe Brady. And, the court "generally" accepted Brady's testimony.

What I learned from him as well as the other witness, and I do not believe that there should be any serious dispute, that this was a very large, very well-organized distribution network. Its very size, inevitably, would lead to some confusion on Mr. Brady's part, but on the whole, I believe he was fair in his description of the events. I believe he was corroborated by other witnesses [regarding pre-1987 activities], some who I didn't see but whose submitted testimony in other forms I have scrutinized, and the exhibits, and I found him to be generally credible.

Sentencing transcript, vol. 346, p. 6. We cannot say that the court clearly erred in finding that Cloutier's drug activities continued beyond November 1987 when the uncontroverted testimony supported such a conclusion. Indeed, Cloutier did not proffer any evidence to the contrary.

■ We find, however, that the court did clearly err in its determination that Cloutier's post–1987 drug activity constituted part of the charged conspiracy. In determining how many conspiracies exist for double jeopardy purposes, we make a "case-specific assay, concentrating on the totality of the evidence and the permissible inferences therefrom." *United States v. David,* 940 F.2d 722, 734 (1st Cir.1991). To help determine whether a single conspiracy or multiple conspiracies exist, we have enunciated certain guidelines. We consider: 1) when the drug activity occurred; 2) the locations of the drug activity; 3) the identities of the persons involved; 4) the co-conspirators' ends; 5) the means used to achieve those ends; and 6) the similarities (or differences) in the evidence used to prove the two conspiracies. *Id. Cf. United States v. Gomez–Pabon,* 911 F.2d 847, 860 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991).

■ We think it helpful to borrow the conspiracy determinants in the double jeopardy arena for our analysis here. In *United States v. David,* 940 F.2d 722, we found that two conspiracies existed. The original conspiracy involved the buying of ten kilograms of cocaine at a time in Florida and selling it in the Boston area. The second distinct conspiracy involved the purchase of far larger amounts of cocaine from Colombia. Although there was some overlap amongst the participants and the object of the two conspiracies was the same, we found that the differences in the two conspiracies outweighed the similarities. The distinguishing factors we found decisive included "the setting of a more ambitious sales quota; the shift to Colombia as the primary source of supply; the elimination of [two main players] from the team; and the targeting and penetration of new market areas." *Id.* at 734.

In *United States v. Hart,* 933 F.2d 80, 86 (1st Cir.1991), we affirmed the finding of separate drug trafficking conspiracies because there was little overlap in the determining factors. While each conspiracy

dealt with cocaine deals, the evidence revealed different transactions in different places with different people. There was no overlap in time, there being a difference of two months between the two conspiracies. The parties named in each indictment, with the exception of the defendant, were completely different. The first conspiracy took place at specific sites in Maine, Rhode Island, and Miami, Florida, while the second conspiracy was limited to different sites in central Maine. The overlap of statutory provisions for each count, 18 U.S.C. § 846, did not belie the separateness of the conspiracies. *Id.* at 86.

A third case is also instructive. In *United States v. Glenn,* 828 F.2d 855 (1st Cir. 1987), we found that separate conspiracies existed. The defendants were convicted of conspiracy to import and possess both marijuana from Thailand and hashish from Pakistan. Although there was an overlap in the two operations (in funding the smuggling boat, the use of the same unloading area, and the same core conspirators), we found that two separate conspiracies existed. One defendant was involved in a conspiracy to smuggle hashish from Pakistan, while another defendant was involved in a conspiracy to smuggle marijuana from Thailand. *Id.* at 858.

In the case before us, the government concedes that Cloutier may have stopped selling cocaine in 1986, but asserts that he continued with Brady in the original goal of the conspiracy, which was to sell marijuana, until 1989.

Using the factors enunciated in the double jeopardy cases as our guide, we find that there were two separate and distinct conspiracies. The first and original conspiracy began in the late 1970's and ended before November 1987. This was the conspiracy for which Cloutier was indicted, convicted, and sentenced. The second conspiracy, for which Cloutier was not charged, began in 1988.

An examination of the facts shows some, although not consequential, overlap in the personnel involved in the pre–1987 conspiracy with the post–1987 conspiracy. The conspiracy count, which served as the pred-

icate act for the CCE count, charged not only Cloutier and Brady, but also Ramon Monsalve Vasquez, William Murdock, Peter Richards, and Robert Carr. With the exception of Brady, none of the other charged co-conspirators were involved in any of Cloutier's drug activities after November 1987. The government argues that McCann's money laundering involvement continued up to March 1988, thereby serving as the single thread to extend the conspiratorial web into Guidelines territory. We find, however, that even if McCann's involvement in the original conspiracy continued beyond November 1987, it is an inadequate linchpin for finding the continuation of the conspiracy.

As in our decisions in *David, Hart,* and *Glenn,* we find that the common factors in the two conspiracies were not sufficient to establish one continuing conspiracy. First and foremost, the nature and extent of Cloutier's pre–1987 and post–1987 drug activities differ significantly. The pre–1987 conspiracy involved the purchase, distribution, and sale of over 24,000 pounds of marijuana and forty kilograms of cocaine, with an average purchase of 400 pounds of marijuana and one pound to one kilogram of cocaine during one transaction. In contrast, Cloutier's post–1987 drug activities generally involved only the purchase of one pound of marijuana at a time. These later purchases were primarily for Cloutier's personal use and supplementing his income through one-ounce sales of marijuana. The only evidence regarding Cloutier's drug activity after November 1987 was Brady's testimony that Cloutier's marijuana drug transactions were: "[O]ff and on. It was—we had nowhere near what we did before. It was like we'd buy a pound of marijuana and sell ounces, so that we could have our own marijuana for free."

Moreover, the pre–1987 conspiracy involved the purchase of marijuana and cocaine primarily in Florida. After 1987, Cloutier and Brady purchased their marijuana in Lawrence, Massachusetts. The pre–1987 conspiracy was proven through corroborating testimony from several witnesses and by documents. Brady's testi-

mony, on the other hand, was the sole evidence regarding Cloutier's drug activity after 1987.

With due deference to the district court, we cannot find that the original conspiracy to possess and distribute marijuana and cocaine continued beyond November 1987. It encompassed over 24,000 pounds of marijuana, forty kilograms of cocaine, at least forty-six people,[3] and the traversing of eastern interstate boundaries. There is no continuum of people, objectives, and type of operation beyond November 1987. The conspiracy with which Cloutier was charged was a large scale, money-making business operation. After November 1987, Cloutier was engaged in purchasing marijuana primarily for his own use.

We find that the court clearly erred in determining that the original conspiracy continued until March 1989. Because it is undisputed that the CCE count was based on the conspiracy evidence, the termination date of the conspiracy applies also to the CCE count. We conclude that the evidence supports only the existence of a conspiracy up to October 1987, when Cloutier stopped dealing cocaine. It follows that the court erred in using the Guidelines to sentence Cloutier on the conspiracy and CCE counts.[4]

## II. SENTENCING

Our finding that the district court erred in applying the Guidelines to Cloutier's sentencing requires us to proceed one step further. We feel it incumbent upon us to clarify possible double jeopardy concerns in the resentencing.

In *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), the Court held that the double jeopardy

clause prohibits cumulative punishment for violations of § 846 (conspiracy) and § 848 (CCE). *Id.* at 155–58, 97 S.Ct. at 2218–20. Following *Jeffers*, we recently held in *United States v. Rivera–Martinez*, 931 F.2d 148 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 184, 116 L.Ed.2d 145 (1991), that the double jeopardy clause requires a court to vacate both the conviction *and* sentence on the "lesser included" drug conspiracy charge when the defendant is also convicted of a continuing criminal enterprise. *Id.* at 152–53. *See also Stratton v. United States*, 862 F.2d 7, 9 (1st Cir.1988). This is in keeping with the majority position of our sister circuits. *See, e.g., United States v. Bafia*, 949 F.2d 1465, 1474 (7th Cir.1991); *United States v. Nixon*, 918 F.2d 895, 908 (11th Cir.1990); *United States v. Stallings*, 810 F.2d 973, 975–76 (10th Cir.1987) (listing cases from other circuits). *Contra United States v. Aiello*, 814 F.2d 109, 115 (2d Cir.1987) (holding that court can increase CCE sentence solely to account for vacating sentence on lesser included drug conspiracy); *United States v. Grayson*, 795 F.2d 278, 287 (3d Cir.), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987) (court has discretion to increase sentence for CCE conviction after vacating conspiracy conviction).

There is no dispute that the conspiracy evidence served to establish the "continuing series of violations" and "in concert" requirements needed to show a continuing criminal enterprise. Therefore, we remand to the district court for a pre-Guidelines sentence. This is what Cloutier requested. He recognizes the risks involved in a new sentence under the applicable statute.[5]

Because we conclude that the Guidelines do not apply to Cloutier's sentencing, we need not address the issue of whether the

---

3. This number includes both indicted and undicted co-conspirators.

4. The government contends that even if the 1988–89 sales of marijuana were not part of the charged conspiracy, they still constitute "relevant conduct" and can be included in any guidelines calculation. The government's argument is a non sequitur. Before the issue of "relevant conduct" comes into play, the Guidelines themselves must first apply, *see generally United States v. Garcia*, 954 F.2d 12, 17 (1st Cir.1992);

*United States v. Sklar*, 920 F.2d 107, 110 (1st Cir.1990). They do not apply here.

5. The court has discretion to sentence Cloutier to the statutory maximum of life imprisonment. Counsel for the appellant was explicitly asked at oral argument if his client understood the risk involved; the court was told that he did. We are not, of course, suggesting or hinting as to the length of the new sentence.

court erred in merging the conspiracy and CCE counts under U.S.S.G. § 3D1.2(d). That is for another day.

Reversed. Remanded for resentencing. The original sentence must be vacated.

CAMPBELL, Senior Circuit Judge (dissenting).

I respectfully disagree that the district court committed *clear error* when it found that Cloutier was part of a single conspiracy that endured into 1989. I would, therefore, affirm its ruling that the Sentencing Guidelines are applicable.

Whether a conspiracy is multiple or single is a question of fact. *United States v. David,* 940 F.2d 722, 732 (1st Cir.1991). This court should review the district court's finding of a single conspiracy much as it would review the resolution of disputed facts in, say, a motion to suppress. Our cases indicate that a reviewing court will uphold a determination of whether there was one or several conspiracies so long as the record reveals sufficient facts to have enabled a reasonable fact finder to reach the result it did. Evidence bearing on the number and nature of conspiracies is frequently circumstantial. What inferences to draw is left to the fact finder so long as these are reasonable. Where more than one inference might be reasonable, a reviewing court should uphold the fact finder's inference unless no reasonable fact finder could draw such an inference. Here, I submit, the facts easily sustain an inference of a single conspiracy even though an alternative inference of two conspiracies is also possible.

Among the facts pointing towards a continuation of the original conspiracy into 1987, 1988 and early 1989 are the following: In 1987, 1988 and early 1989, Cloutier was still selling marijuana with Michael Brady, with whom he had worked continuously, with one hiatus, since 1979. Cloutier also maintained relations with his original money-laundering partner, McCann, until 1988—he and McCann had been continuously associated from the mid–1970's. In 1988 and thereafter, Cloutier was not only buying and selling small quantities of low qual-

ity marijuana, but he and Brady, in 1989, bought high quality sensemilla marijuana in pound quantities and sold it for $160–$200 an ounce. While Cloutier had turned more to selling cocaine in 1981 through mid–1987, the conspiracy had begun in the 1970's with the sale of locally-purchased marijuana; and Cloutier and his associates continued to sell marijuana—some of it locally bought—even when their chief commodity was Florida-purchased cocaine. After ceasing to sell cocaine in mid–1987, Cloutier continued to sell marijuana—the substance he had initially peddled and had never stopped selling. The locus of the selling activities was, at all times, Lowell and Southern New Hampshire. As the government states in its brief:

Their volume of business, wealth, number of co-conspirators, and sale of other drugs ebbed and flowed over the following decade. But in 1988–89, Cloutier and Brady were still together, selling marijuana for profit in the area of Lowell and southern New Hampshire. Cloutier may have stopped selling cocaine in 1986, but he continued with Brady in the original goal of the Conspiracy—marijuana sales.

A key factor in finding whether or not there is a single conspiracy is whether the evidence sufficiently shows that the conspirators "directed their efforts towards the accomplishment of a common goal or overall plan." *United States v. Drougas,* 748 F.2d 8, 17 (1st Cir.1984). *See United States v. Elam,* 678 F.2d 1234, 1246 (5th Cir.1982) ("Common purpose"). The judge here could reasonably find that the conspiracy's goal was, at all times, the sale of illegal drugs in Cloutier's home area in New England—chiefly marijuana and cocaine. Even in 1988, certain of the same people remained—Cloutier himself and Brady, with McCann to launder the money. To be sure, in the final years the venture turned somewhat sour; Cloutier may have lost his grip; most co-conspirators may have left. But it was open to the fact finder to decide whether the weakening of Cloutier's drug business, and the cessation of selling cocaine, constituted the end of the original conspiracy and the beginning

of another. While there are undoubtedly points to be made in favor of the two conspiracy theory, the goal of the "second" conspiracy remained little different from the first. I cannot see the "clear error" in Judge Mazzone's inference that Cloutier's activities in late 1987 and 1988 were simply a continuation of the old conspiratorial agreement. Indeed, there is little in the court's opinion to explain why it believes the lower court's alleged error was so "clear." My colleagues' opinion is written in terms of simple disagreement; it does not point out anything seriously garbled in the lower court's analysis. To be sure, the argument for *two* conspiracies is plausible enough. But the question is not one over which an appellate court exercises de novo review; and there is no case law that I can discern rendering Judge Mazzone's alternative view fatally flawed. The cases this court purports to rely upon are all factually quite different. *David,* indeed, strongly emphasizes the fact-bound nature of a decision like this, the very point my colleagues ignore. As I see nothing very unreasonable about Judge Mazzone's assessment of this record, I think we should let stand his finding of a single conspiracy.

This leads to the question of the CCE. Cloutier was not overseeing five or more persons by late 1987 and 1988. However, the government relies on *United States v. Sinito,* 723 F.2d 1250, 1261 (6th Cir.1983), a Sixth Circuit case which reiterates the rulings in cases from the Second and Fifth Circuits, to the effect that the five individuals need not all act together at the same time. It is clear that Cloutier acted with many more than five people over the life of the entire enterprise. He could be found to have been a supervisor or organizer for most of the time—perhaps for all of the time—and, especially assuming the conspiracy ran through 1989, the continuing criminal enterprise could be found to have continued up till then also. He clearly received substantial income. Hence, I believe the CCE, as well as conspiracy, was permissibly found by Judge Mazzone to have overlapped the adoption of the 1987 guidelines.

I would, therefore, hold that the district judge, when sentencing Cloutier, did not err in ruling that the Sentencing Guidelines were controlling.