The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 10, 2025

## 2025COA65

**No. 24CA0907, *Mountain Coal Company, LLC v. Water Quality Control Division of the Colorado Department of Public Health and Environment* — Public Health and Environment — Colorado Water Quality Control Act — Colorado Discharge Permit System — Stormwater Discharge Permits — Overburden Contamination — Uncontaminated Stormwater Runoff**

A division of the court of appeals holds, as a matter of first impression, that, under Department of Public Health and Environment Regulation 61, 5 Code Colo. Regs. 1002-61, stormwater discharge from a point source associated with industrial activity is not subject to the discharge permit requirement of the Colorado Water Quality Control Act unless it is contaminated by contact with overburden.

Court of Appeals No. 24CA0907
Gunnison County District Court No. 22CV30061
Honorable J. Steven Patrick, Judge

Mountain Coal Company, LLC,

Plaintiff-Appellant,

v.

Water Quality Control Division of the Colorado Department of Public Health and Environment, Center for Biological Diversity, WildEarth Guardians, High Country Conservation Advocates, and Sierra Club,

Defendants-Appellees.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE J. JONES
Kuhn and Moultrie, JJ., concur

Announced July 10, 2025

Clark Hill PLC, Gabe Racz, Justine C. Beckstrom, Boulder, Colorado, for Plaintiff-Appellant

Philip J. Weiser, Attorney General, Michael C. Landis, First Assistant Attorney General, Carrie Noteboom, Assistant Deputy Attorney General, Rachel Kassler, Assistant Attorney General, Denver, Colorado, for Defendant-Appellee Water Quality Control Division of the Colorado Department of Public Health and Environment

Edward B. Zukoski, Allison N. Henderson, Crested Butte, Colorado, for Defendants-Appellees Center for Biological Diversity, WildEarth Guardians, High Country Conservation Advocates, and Sierra Club

¶ 1    Mountain Coal Company, LLC (the Company), appeals the district court's judgment affirming the decision of the Colorado Department of Public Health and Environment's Water Quality Control Division (the Division) to issue a renewal permit regulating certain discharges of stormwater at the Company's mine. The Division regulated the discharges because it determined that the stormwater contacts "overburden" (a term discussed below) at the mine.

¶ 2    We conclude that, under the applicable statutes and regulations, stormwater runoff's contact with overburden alone isn't sufficient; the Division must determine that such contact contaminates the runoff before it may require a permit regulating the stormwater discharge. Because the Division failed to do so before it renewed the Company's stormwater discharge permit, and because uncontested evidence in the record shows that the stormwater at issue isn't contaminated by contact with overburden, we reverse the district court's judgment as to the discharge sources to which this challenge by the Company applies and remand the case with directions to order the Division to remove the challenged stormwater discharge restrictions from the Company's renewal

1

permit as to those sources. We affirm the judgment, however, as to the one discharge source the Company challenges based solely on the purported impropriety of the administrative proceedings, as that challenge fails.

## I.    Regulatory Framework

¶ 3    Congress enacted the Clean Water Act, 33 U.S.C. §§ 1251-1376, "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). In furtherance of this goal, the Act establishes a National Pollutant Discharge Elimination System (NPDES) permitting program to regulate water pollution emanating from a "point source." 33 U.S.C. § 1342; *see* 33 U.S.C. § 1362(14) (defining "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container . . . from which pollutants are or may be discharged"). "Where the source of a pollutant is a point source, and the pollutant is discharged into navigable waters, the source must obtain a . . . permit limiting and controlling both the amount and type of pollutants which can be lawfully discharged." *Nat'l*

*Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 582 (6th Cir. 1988) (emphasis omitted); *see* 33 U.S.C. §§ 1311(a), 1342(a).

¶ 4    But there are exceptions to the permit requirement.  As relevant in this case, § 1342(*l*)(2) provides that a permit is not required "for discharges of stormwater runoff from mining operations . . . composed entirely of flows . . . which are not contaminated by contact with, or do not come into contact with, any overburden."  The Environmental Protection Agency (EPA) adopted a regulation — 40 C.F.R. § 122.26(a)(2)(i) (2025) — governing stormwater runoff from mining operations.  It provides in relevant part as follows: "The Director may not require a permit for discharges of storm water runoff from . . . [m]ining operations composed entirely of flows . . . which are not contaminated by contact with[,] or that have not come into contact with, any overburden . . . ."  *Id.*

¶ 5    The EPA has authorized the Colorado Department of Public Health and Environment (CDPHE) to administer the NPDES permitting program in Colorado.  *See generally* § 1342(b).  Within CDPHE, both the Water Quality Control Commission (the Commission) and the Division carry out the program in accordance

3

with the Colorado Water Quality Control Act, §§ 25-8-101 to -1008, C.R.S. 2024, and the state regulations promulgated thereunder. Under Colorado's permitting program, the Commission promulgates regulations regarding the control of water pollutants, and the Division enforces and administers those regulations. *See* § 25-8-202, C.R.S. 2024 (the Commission's duties); § 25-8-302, C.R.S. 2024 (the Division's duties). With respect specifically to permitting for discharge of pollutants, the General Assembly has directed the Commission to "promulgate such regulations as may be necessary and proper for the orderly and effective administration of permits" and has mandated that such regulations "be consistent with . . . federal requirements." § 25-8-501(3), C.R.S. 2024.

¶ 6    Pursuant to these directives, the Commission promulgated Regulation 61, 5 Code Colo. Regs. 1002-61 (Regulation 61) — the regulation at issue in this case — which governs the permitting process for point source stormwater discharges in Colorado. *Id.*; *see also* 40 C.F.R. pt. 122 (2025) (Regulation 61's federal counterpart). It requires any "person" (as defined in Regulation 61.2(73)) to obtain a permit before discharging stormwater from a point source associated with industrial activity. Dep't of Pub.

Health & Env't Regs. 61.2(73), 61.3(2)(e)(ii), 5 Code Colo. Regs. 1002-61; *see also id.* at Reg. 61.3(2)(e)(iii)(C) (including coal mining among the types of facilities that engage in industrial activity). But, consistent with federal law, a permit isn't required for "stormwater runoff from mining operations" that is "composed entirely of flows . . . which are not contaminated by contact with[,] or that have not come into contact with, any overburden" at the mining site. *Id.* at Reg. 61.3(2)(c); *accord* § 1342(*l*)(2); 40 C.F.R. § 122.26(a)(2)(i); *see* Dep't of Pub. Health & Env't Reg. 61.2(71), 5 Code Colo. Regs. 1002-61 (defining "overburden" as "any material of any nature, consolidated or unconsolidated, that overlies a mineral deposit, excluding topsoil or similar naturally-occurring surface materials that are not disturbed by mining operations").

¶ 7    When a permit is required for discharging stormwater from a point source, the Division "shall be solely responsible for the [permit's] issuance and enforcement." § 25-8-202(7)(b)(I). As part of this process, permittees must apply to renew their permits every five years. *See* Dep't of Pub. Health & Env't Regs. 61.9(2)(g), 61.10(a), 5 Code Colo. Regs. 1002-61. Once the Division renews a permit, any person affected or aggrieved by the Division's

5

determination may request an adjudicatory hearing to challenge the permit's terms and conditions. *Id.* at Reg. 61.7(a). The person requesting the adjudicatory hearing generally bears the burden of proof at the hearing. *Id.* at Reg. 61.7(d).

## II. Factual and Procedural History

¶ 8 The Company operates West Elk Mine, an underground coal mine in Gunnison County. Mining operations began in the 1980s, when the Company received permits (1) authorizing the extraction of coal from what is now the Colorado Department of Natural Resources' Division of Reclamation, Mining, and Safety; and (2) authorizing stormwater discharge flows from the mine into the Gunnison River at multiple distinct point sources, which the parties refer to as "outfalls," from the Division.

¶ 9 The Division renewed the Company's stormwater discharge permit in 1995. Two years later, the Company expanded West Elk Mine by building ventilation and access facilities, an electrical substation, power lines, and support facilities along an access road within Sylvester Gulch. Sylvester Gulch is south of the main mining site, and stormwater runoff in the gulch is a tributary of the Gunnison River.

¶ 10    In 1999, the Company applied for another renewal of its stormwater discharge permit. Its application included updated maps reflecting the new Sylvester Gulch facilities but didn't identify certain outfalls in the gulch that discharge stormwater. The Division renewed the Company's permit in 2004.

¶ 11    When the Company applied for a third renewal permit in 2008, it again didn't identify certain outfalls in Sylvester Gulch that discharge stormwater. The Division administratively extended the Company's permit to gather more information. An inspector from the Division visited West Elk Mine in 2010 and 2018 and requested additional information from the Company, including maps, a description of its stormwater management plan, and a list of all stormwater outfalls that the Company hadn't identified in its previous applications.

¶ 12    The Division renewed the Company's permit in 2019. In addition to the previously-regulated outfalls, the renewal permit included seven outfalls in Sylvester Gulch (the Sylvester Gulch outfalls) — referred to as Outfalls 25, 26, 27, 30, 32, 33, and 34 — and one outfall near a train loading area (the train loading area outfall) — referred to as Outfall 35. The Division imposed effluent

7

limitations on all of the outfalls. *See* Dep't of Pub. Health & Env't Reg. 61.2(26), 5 Code Colo. Regs. 1002-61 (effluent limitations restrict or prohibit the quantities, rates, and concentrations of pollutants discharged from point sources).

¶ 13     The Company challenged the 2019 renewal permit on the basis that the permit improperly included and regulated the Sylvester Gulch outfalls and the train loading area outfall. The Division granted the Company's request for an adjudicatory hearing. The presiding Administrative Law Judge (ALJ) allowed the Center for Biological Diversity, WildEarth Guardians, High Country Conservation Advocates, and the Sierra Club (collectively, the Public Interest Groups) to intervene as parties.

¶ 14     After a three-day hearing, the ALJ issued an initial decision upholding the renewal permit's terms and conditions. CDPHE's executive director subsequently issued a final agency order affirming the ALJ's decision.

¶ 15     The Company appealed to the district court, *see* § 24-4-106(4), C.R.S. 2024, which affirmed the executive director's final agency order.

## III. Discussion

¶ 16    The Company challenges the inclusion of the Sylvester Gulch outfalls in the 2019 renewal permit on five bases: (1) the outfalls don't require a stormwater discharge permit from the Division because they are exempt under Regulation 61; (2) the Division lacked jurisdiction to regulate the outfalls; (3) the Division erroneously imposed effluent limitations on the outfalls; (4) the Division failed to consider the permit's economic reasonableness before renewing it; and (5) the ALJ improperly allocated the burden of proof at the adjudicatory hearing. We agree with the Company's first challenge with respect to the Sylvester Gulch outfalls and therefore don't address the others.

¶ 17    The Company also challenges the renewal permit's inclusion of the train loading area outfall but on only one of the above bases. It contends that the stormwater regulations for this outfall must be

9

set aside because the ALJ improperly allocated the burden of proof at the adjudicatory hearing.[1] We reject that contention.

A.     Standards of Review and Principles of Regulatory Construction

¶ 18     We review a final agency decision de novo, standing in the same position as the district court. *Martelon v. Colo. Dep't of Health Care Pol'y & Fin.*, 124 P.3d 914, 916 (Colo. App. 2005). We will reverse only if the final agency decision is "arbitrary or capricious, in excess of statutory authority, not in accord with the procedures or procedural limitations of the [State Administrative Procedure Act] or as otherwise required by law, an abuse or clearly unwarranted exercise of discretion, unsupported by substantial evidence, or otherwise contrary to law." *HCA-HealthONE LLC v. Colo. Dep't of Lab. & Emp.*, 2020 COA 52, ¶ 28 (citing § 24-4-106(7)(b)). "In applying this standard, we presume the validity and regularity of administrative proceedings and resolve all reasonable doubts as to the correctness of administrative rulings in favor of the agency."

---

[1] The Company made additional arguments below about why the Division shouldn't have included the train loading area outfall in the renewal permit, but it abandons those arguments on appeal. *See McLellan v. Weiss*, 2024 COA 114, ¶ 10 n.2 (arguments raised below but not raised on appeal are deemed abandoned).

*Gessler v. Grossman*, 2015 COA 62, ¶ 11, *aff'd sub nom. Gessler v. Smith*, 2018 CO 48.

¶ 19 We won't disturb a hearing officer's factual findings unless they are clearly erroneous. *Neppl v. Colo. Dep't of Revenue*, 2019 COA 29, ¶ 9; *see* § 24-4-106(7)(b)(VII). "The credibility of witnesses, the weight to be afforded the evidence, and the resolution of conflicting evidence are factual matters solely within the hearing officer's province as the trier of fact." *Neppl*, ¶ 9 (citing *Long v. Colo. Dep't of Revenue*, 2012 COA 130, ¶ 7).

¶ 20 We construe administrative regulations de novo, giving full effect to the promulgating body's intent. *Brunson v. Colo. Cab Co.*, 2018 COA 17, ¶ 10. "In construing an administrative regulation, we apply the same rules of construction that we would apply in interpreting a statute." *Id.* (citing *Berumen v. Dep't of Hum. Servs.*, 2012 COA 73, ¶ 19). We look first to the regulation's plain language, "read[ing] and consider[ing] the regulatory scheme as a whole to give consistent, harmonious, and sensible effect to all of its parts." *Berumen*, ¶ 19 (citing *Cendant Corp. & Subsidiaries v. Dep't of Revenue*, 226 P.3d 1102, 1106 (Colo. App. 2009)).

¶ 21   As with a statute, if a regulation's plain language is clear, we enforce it as written and don't resort to other rules of construction. *Id.* But if the language is susceptible of two or more reasonable interpretations leading to different results, the regulation is ambiguous, and we may then "look beyond the express regulatory language for other evidence of the promulgating body's intent and purpose." *Brunson,* ¶¶ 15-16. As relevant in this case, we may consider the "legislative history," "former statutory provisions, including laws upon the same or similar subjects," and "[t]he consequences of a particular construction." § 2-4-203(1)(c)-(e), C.R.S. 2024. We may also consider relevant "statutory history" — "the evolution of a statute as it is amended over time by the legislature." *Carrera v. People,* 2019 CO 83, ¶ 24 n.6 (quoting *Colo. Oil & Gas Conservation Comm'n v. Martinez,* 2019 CO 3, ¶ 30 n.2 (distinguishing between "statutory history" and "legislative history")).

¶ 22   While we defer to an agency's reasonable interpretation of its own regulations, we aren't bound by an agency decision that misapplies or misconstrues the law. *El Paso Cnty. Bd. of Equalization v. Craddock,* 850 P.2d 702, 704-05 (Colo. 1993); *see*

*also Kaiser v. Aurora Urb. Renewal Auth.*, 2024 CO 4, ¶ 30 ("An agency's interpretation 'of its own rules is generally entitled to great weight unless it is plainly erroneous or inconsistent with . . . the underlying statute.'" (quoting *Berumen*, ¶ 25)).

### B.     Regulation 61's Exemption Provision

¶ 23     As noted, Regulation 61 requires a permit for discharges of stormwater associated with industrial activity.  Dep't of Pub. Health & Env't Reg. 61.3(1)(a), (2)(a), (2)(e)(ii), 5 Code Colo. Regs. 1002-61.  But this requirement is subject to the following exemption provision:

> The Division *may not require a permit* for discharges of stormwater runoff from mining operations or oil and gas exploration, production, processing or treatment operations or transmission facilities, composed entirely of flows which are from conveyances or systems of conveyances (including but not limited to pipes, conduits, ditches, and channels) used for collecting and conveying precipitation runoff and *which are not contaminated by contact with or that have not come into contact with, any overburden*, raw material, intermediate products, finished product, byproduct or waste products located on the site of such operations.

*Id.* at Reg. 61.3(2)(c) (emphases added); *see also id.* at Reg. 61.3(2)(a).

13

¶ 24    The ALJ, the executive director, and the district court interpreted the exemption provision as *requiring* a permit under one of two circumstances: (1) when stormwater flows come into contact with overburden or (2) when stormwater flows are contaminated by contact with overburden.  They upheld the Division's decision to require a permit for the Sylvester Gulch outfalls under the first circumstance, reasoning that because the outfalls discharge stormwater that contacts overburden, they aren't exempt from the permit requirement.

¶ 25    But the exemption provision clearly says that a permit is *not* required in either of two circumstances: (1) when stormwater flows have *not* contacted overburden *or* (2) when stormwater flows are *not* contaminated by contact with overburden.  The use of the disjunctive "or" means that either circumstance independently warrants an exemption from the permit requirement.  *See Lombard v. Colo. Outdoor Educ. Ctr., Inc.,* 187 P.3d 565, 571 (Colo. 2008) ("[W]e presume the disjunctive use of the word 'or' marks distinctive categories.").  To put a bit of a finer point on it, if stormwater discharge doesn't contact overburden, a permit isn't required, but even if it does contact overburden, a permit isn't required if such

14

contact doesn't contaminate the stormwater. This interpretation of the exemption provision gives effect to all its parts.

¶ 26    The construction adopted by the ALJ, the executive director, and the district court, and urged by the Division and the Public Interest Groups, does not. Rather, it renders an entire phrase superfluous: If mere contact with overburden were enough to require a permit, it would be pointless to identify lack of contamination by contact as a separate circumstance under which the Division may not require one. *See Lombard*, 187 P.3d at 571 ("[W]hen examining a statute's language, we give effect to every word and render none superfluous because we 'do not presume that the legislature used language idly and with no intent that meaning should be given to its language.'" (quoting *Colo. Water Conservation Bd. v. Upper Gunnison River Water Conservancy Dist.*, 109 P.3d 585, 597 (Colo. 2005))); *Carruthers v. Carrier Access Corp.*, 251 P.3d 1199, 1204 (Colo. App. 2010) (rejecting proposed interpretation of statute that would render part of it meaningless); § 2-4-201(1)(b),

C.R.S. 2024 (we must presume that the General Assembly intended that the entire statute be effective).[2]

¶ 27    The Division and the Public Interest Groups don't really contest this point.  Instead, in urging us to adopt the ALJ's, the executive director's, and the district court's interpretation of the exemption provision, the Division and the Public Interest Groups point to a separate provision that, they say, would conflict with our interpretation.  That provision considers "mining operations . . . that discharge stormwater contaminated by contact with[,] or that

---

[2] It appears that, in essence, the ALJ, the executive director, and the district court canceled out the provision's negatives — the "not"s — to form a positive.  *See generally People v. Bannister*, 902 N.E.2d 571, 592 (Ill. 2008) (explaining the grammatical construction of double negatives); Merriam-Webster Dictionary, https://perma.cc/QFB3-6CEC (defining "double negative" as "a now nonstandard syntactic construction containing two negatives and having a negative meaning").  But because the negatives in the exemption provision modify different words, they aren't self-cancelling double negatives, as exemplified in phrases such as "I don't have no money."  That is, as the regulation is written, one "not" shouldn't be construed as being canceled out by another.  *Cf. Bannister*, 902 N.E.2d at 592 ("A double negative 'consists of more than one negative . . . *for a single negation.*'  A double negative 'is a statement that contains two negative modifiers, *the second of which repeats the message of the first.*'" (first quoting Martin Steinmann & Michael Keller, *Good Grammar Made Easy* 112 (1995); and then quoting Lynn Quitman Troyka, *Simon & Schuster Handbook for Writers* 295 (2d ed. 1990))).

16

has come into contact with, any overburden" "to be engaging in 'industrial activity.'" Dep't of Pub. Health & Env't Reg. 61.3(2)(e)(iii)(C), 5 Code Colo. Regs. 1002-61; *see Gonzales v. Allstate Ins. Co.*, 51 P.3d 1103, 1106 (Colo. App. 2002) ("[W]hen interpreting two statutory sections, we must attempt to harmonize them to give effect to their purposes and, if possible, reconcile them . . . ." (citing *Norsby v. Jensen*, 916 P.2d 555, 559 (Colo. App. 1995))).  But that provision merely describes facilities that engage in industrial activity for purposes of the permit requirement, which itself is subject to the exemption provision at issue.  *See* Dep't of Pub. Health & Env't Reg. 61.3(2)(e)(ii)(A), 5 Code Colo. Regs. 1002-61.  Thus, interpreting the exemption provision as we do doesn't create a conflict.

¶ 28    In any event, to the extent any inconsistency between Regulation 61.3(2)(e)(iii)(C) and the exemption provision renders the latter susceptible of more than one reasonable interpretation, several canons of statutory construction support our conclusion that the Division may not require a permit for uncontaminated stormwater runoff.

¶ 29    First, the statutory and legislative history of the stormwater discharge permitting program demonstrates a clear intent to exempt uncontaminated stormwater runoff from the permit requirement. *See* § 2-4-203(1)(c)-(d) (if a statute is ambiguous, the court may consider legislative history and former statutory provisions on the same subject); *Martinez,* ¶¶ 30-36, 30 n.2 (considering "statutory history").

¶ 30    Shortly after Congress enacted the Clean Water Act in the 1970s, the EPA implemented regulations generally exempting stormwater discharge from the permit requirement unless such discharge significantly contributed to water pollution. *See* 40 C.F.R. § 125.4 (1975). Environmental advocacy groups successfully challenged these regulations in court as being too limited in scope. *See, e.g., Nat. Res. Def. Council, Inc. v. Costle,* 568 F.2d 1369, 1377 (D.C. Cir. 1977) ("[T]he EPA Administrator does not have authority to exempt categories of point sources from the permit requirements . . . ."). In response, Congress enacted the Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7 (codified as amended at § 1342(*l*)-(p)), which amended the Clean Water Act by expanding the NPDES permitting program to generally require

permits for industrial stormwater discharge.  *See* § 1342(p)(2).  But

in the conference report accompanying an earlier version of these

amendments,[3] Congress expressed its intent to impose limits on the

expanded program:

> The [amended version of the bill agreed to by the House of Representatives and Senate] . . . *add[s] a provision dealing with contamination by contact* with raw materials or waste products based on the Senate bill.
>
> The [amended version] provides that permits are not required where stormwater runoff is diverted around mining operations or oil and gas operations and does not come in contact with overburden, raw material, product, or process wastes.  *In addition, where stormwater runoff is not contaminated by contact with such materials, as determined by the Administrator, permits are also not required.*

H.R. Rep. No. 99-1004, at 151 (1986) (Conf. Rep.) (emphases

added); *see Fontanari v. Snowcap Coal Co.*, 2023 COA 29, ¶ 30

---

[3] The conference report accompanied Senate Bill 1128, which was unanimously approved by the 99th Congress but pocket vetoed by the President.  The following year, leaders of both houses of the 100th Congress agreed to introduce, and the House and Senate ultimately passed, H.R. 1, the Water Quality Act of 1987, containing the same provisions as the conference report from the 99th Congress.  No new conference report was submitted.  The President vetoed H.R. 1, and the House and Senate voted to override the veto, at which point the Water Quality Act of 1987 was enacted as Public Law 100-4.  H.R. Rep. No. 100-1121, at 13-14 (1988).

(considering a House of Representatives report to help discern Congress's intent).[4]

¶ 31    In the preamble to the regulations implemented pursuant to the Clean Water Act's amendments, the EPA explained why Congress decided to require permits for industrial stormwater discharge but exempt uncontaminated runoff from the requirement:

> Because [oil, gas, and mining facilities] have the potential for serious water quality impacts, Congress recognized . . . the need to control storm water discharges from oil, gas, and mining operations, as well as those associated with other industrial activities.
>
> However, Congress also recognized that there are numerous situations in the mining and oil and gas industries where storm water is channeled around plants and operations through a series of ditches and other structural devices in order to prevent pollution of the storm water by harmful contaminants. From the standpoint of resource drain on both [the] EPA as the permitting agency and potential permit applicants, the conclusion was that operators that use good management practices and make expenditures to prevent

---

[4] At oral argument, counsel for the Division tried to cast doubt on the conference report's applicability in this case — asserting that it applies to wastewater, not stormwater — and suggested that we should not consider it to help discern Congress's intent. We reject that suggestion. The report's language clearly addresses whether a discharge permit is required for stormwater runoff that contacts overburden at a mining operation.

> contamination must not be burdened with the
> requirement to obtain a permit. Hence,
> [§ 1342(*l*)(2)] creates a statutory exemption
> from storm water permitting requirements for
> uncontaminated runoff from these facilities.

Nat'l Pollutant Discharge Elimination Sys. Permit Application Reg. for Storm Water Discharges, 55 Fed. Reg. 47990-01, 48029 (Nov. 16, 1990) (codified at 40 C.F.R. pts. 122, 123, 124). The EPA continued,

> To implement [§ 1342(*l*)(2)], [the] EPA intends
> to require permits for contaminated storm
> water discharges from oil, gas and mining
> operations. Storm water discharges that are
> not contaminated by contact with any
> overburden, raw material, intermediate
> products, finished product, byproduct or waste
> products located on the site of such operations
> will not be required to obtain a storm water
> discharge permit.

*Id.*[5]

¶ 32     Though this statutory and legislative history pertains to the federal stormwater discharge permitting program, it carries great

---

[5] As noted above, 33 U.S.C. § 1342(*l*)(2) says that a permit isn't required if stormwater runoff is "composed entirely of flows . . . which are not contaminated with, or do not come into contact with, any overburden." *Accord* 40 C.F.R. § 122.26(a)(2)(i) (2025). These federal provisions, therefore, make clear that a permit isn't required if *either* the runoff doesn't contact overburden *or* the runoff does contact overburden but isn't contaminated when it does so.

weight in helping us construe the matching provisions of Colorado's program. After all, Regulation 61 governs the administration of the federal program at the state level, and the exemption provision uses language substantially similar to that of its federal counterpart to "[e]nsure that Colorado's regulations are consistent with the federal requirements." Dep't of Pub. Health & Env't Reg. 61.36(E), 5 Code Colo. Regs. 1002-61. *Compare id.* at Reg. 61.3(2)(c), *with* 40 C.F.R. § 122.26(a)(2)(i), *and* § 1342(*l*)(2); *see also* § 25-8-501(3) (Colorado's regulations must be "consistent with . . . federal requirements."). Indeed, Regulation 61 itself says, "The Clean Water Act . . . requires that in order to maintain delegated authority [to administer the NPDES permitting program], a state must have regulations that are consistent with the federal regulations" and that "[i]ncluding stormwater discharges in an efficient manner in the [permitting] program in the State of Colorado . . . requires that the regulations

be consistent with the federal rules." Dep't of Pub. Health & Env't Reg. 61.36(D)(2), 5 Code Colo. Regs. 1002-61.[6]

¶ 33    Second, at least one federal court has interpreted the NPDES permitting program as exempting uncontaminated stormwater runoff from the permit requirement. *See Colo. Civ. Rts. Comm'n v. Big O Tires, Inc.*, 940 P.2d 397, 399 (Colo. 1997) (federal cases interpreting federal law, though not controlling, can be helpful where the state statute closely parallels a federal counterpart).

¶ 34    In *Natural Resources Defense Council, Inc. v. EPA*, 526 F.3d 591 (9th Cir. 2008), the Ninth Circuit Court of Appeals described the stormwater regulations in the Clean Water Act, as amended by the Water Quality Act of 1987, explaining that the "EPA's interpretation of [§ 1342(*l*)(2)] was that [the] 'section . . . creates a statutory exemption from storm water permitting requirements for *uncontaminated* runoff from [oil, gas, and mining] facilities.'" *Id.* at 596-97 (quoting 55 Fed. Reg. at 48029).  True, the court analyzed

---

[6] We recognize that Regulation 61.3(2)(c), Dep't of Pub. Health & Env't Reg. 61.3(2)(c), 5 Code Colo. Regs. 1002-61, is worded slightly differently than § 1342(*l*)(2) and 40 C.F.R. § 122.26(a)(2)(i).  But in light of the foregoing considerations, the slight differences in wording don't justify a difference in interpretation.

the exemption in the context of stormwater runoff contaminated by sediment from oil and gas construction activities, not mining activities. *See id.* at 601. Still, the exemption applies across the board to stormwater runoff from oil, gas, *and* mining operations. § 1342(*l*)(2). We therefore find the court's explanation relevant to our analysis.

¶ 35 Third, interpreting Regulation 61 as exempting uncontaminated stormwater runoff from the permit requirement results in a two-step process consistent with the stormwater discharge permitting program's framework. *See* § 2-4-203(1)(e) (we may consider the "consequences of a particular construction").

¶ 36 In the mining context, step one requires the facility proposing a new discharge of stormwater associated with industrial activity to apply for a permit. Dep't of Pub. Health & Env't Reg. 61.4(3)(a)(i), 5 Code Colo. Regs. 1002-61. Step two requires the Division to determine whether the stormwater is contaminated by contact with overburden (or any other material identified in the exemption provision) and, if it is, to issue a permit regulating the stormwater discharge. *See id.* at Reg. 61.3(2)(c).

24

¶ 37     The Public Interest Groups assert that it would be impractical for the Division to determine whether stormwater runoff is contaminated by contact with overburden because such a determination would require the Division to calculate background levels of pollutants, and those levels are difficult to calculate at mining sites.[7]  They claim support for their assertion in the preamble to the EPA's stormwater regulations:

> Comments received . . . suggested that background levels of pollutants would be very difficult to calculate due to the complex topography frequently encountered in alpine mining regions.  For example, if a mine is located in a mountain valley surrounded on all sides by hills, the site will have innumerable slopes feeding flow towards it.  Under such circumstances, determining how the background level is set would prove impractical. . . .  In many instances, data on original background levels may not be available due to long-term site activity.
>
> . . . .
>
> Because of these concerns [the] EPA has decided to drop the use of background levels as a measure for determining whether a permit application is required.  Accordingly, a permit application will be required when discharges of storm water runoff from mining operations come into contact with any overburden, raw

---

[7] Notably, the Division itself doesn't make this argument.

material, intermediate product, finished product, byproduct, or waste product located on the site.

55 Fed. Reg. at 48032. But the Public Interest Groups' answer brief omits the EPA's statement that immediately follows:

> Similar to the . . . test for oil and gas operations, [the] EPA intends to use the "contact" test solely as a permit application trigger. The determination of whether a mining operation's runoff is contaminated will be made in the context of the permit issuance proceedings.
>
> If the owner or operator determines that no storm water runoff comes into contact with overburden, raw material, intermediate product, finished product, byproduct, or waste products, then there is no obligation to file a permit application. This framework is consistent with the statutory provisions of [§ 1342(l)(2)] and is intended to encourage each mining site to adopt the best possible management controls to prevent such contact.

55 Fed. Reg. at 48032. While the EPA acknowledged the difficulty with calculating background levels of pollutants at mining sites, it addressed that difficulty, not by abandoning the calculation requirement altogether, but by placing the onus on the permitting authority to calculate those levels after a permit application has been submitted. *See Nat. Res. Def. Council, Inc. v. EPA*, 966 F.2d

26

1292, 1306-08 (9th Cir. 1992) (explaining that the NPDES exemption gives the EPA Administrator discretion to determine whether stormwater runoff at oil and gas facilities is contaminated and noting, in dicta, that the provision "requires consideration of background levels of any pollutant only with respect to mining operations").[8]

¶ 38    We also reject the Division's assertion that interpreting Regulation 61 as exempting uncontaminated stormwater runoff from the permit requirement "would upend stable permitting processes and policies." The requirement that permittees apply to renew their stormwater discharge permits every five years allows the Division to gather new information, re-evaluate best practices for managing stormwater flows, and update the permits' terms and conditions. *See* Dep't of Pub. Health & Env't Regs. 61.9(2)(g), 61.10(a), 5 Code Colo. Regs. 1002-61. Thus, to the extent the Division has been issuing permits based only on determinations

---

[8] Indeed, considering background levels of pollutants is especially important in light of Congress's intent in enacting the Clean Water Act — to eliminate the discharge of pollutants into navigable waters. *See* 33 U.S.C. § 1251(a)(1). The Division and the Public Interest Groups don't explain how regulating uncontaminated stormwater runoff would serve that goal.

that stormwater flows merely contact overburden, it will have the opportunity to review and correct those permits during the renewal process. Indeed, one of the Division's employees testified before the ALJ that the Division doesn't take a prior permit's terms as a given because "we do a complete review when we're renewing a permit. So we review all the materials over again. We look at any changes in, you know, law or rule or standards. . . . And we look at whether, you know — if we had made an error in a previous permit, we correct that — that permit, that error."

¶ 39     In sum, we conclude that the plain language of Regulation 61's exemption provision is clear: The Division may not require a discharge permit for stormwater that contacts overburden (or any other material identified in the exemption provision) but isn't contaminated by such contact. Likewise, the Division may not require a discharge permit for stormwater that never contacts overburden in the first instance. To the extent the provision could be interpreted as ambiguous, the statutory and legislative history, federal case law, and practical consequences of construing the provision as we have (versus how the Division and the Public Interest Groups would have us do) indicate the enacting authority's

intent to exempt uncontaminated stormwater runoff from the permit requirement.

¶ 40    The Division issued the Company's renewal permit without first determining whether the stormwater discharged from the Sylvester Gulch outfalls is contaminated by contact with overburden.  While we could remand the case for further proceedings to determine whether there is contamination, we don't need to do so in this case because uncontested evidence in the record shows that the stormwater from the Sylvester Gulch outfalls isn't contaminated by contact with overburden.  *See Scherr v. Colo. Dep't of Revenue*, 49 P.3d 1217, 1219-20 (Colo. App. 2002) (when a hearing officer's order erroneously interpreted the law in a driver's license revocation proceeding, remand for further findings was inappropriate because undisputed evidence showed the licensee's breath alcohol content test was invalid); *cf. Larimer Cnty. Bd. of Comm'rs v. Colo. Prop. Tax Adm'r*, 2013 COA 49M, ¶¶ 92-96 (when the board of commissioners denied an organization's application for property tax exemptions based on a flawed interpretation of the law, remand was necessary because the record evidence as to whether

the organization qualified for the exemptions under the correct legal standard remained in dispute).

¶ 41     At the adjudicatory hearing, the Company presented evidence that the concentration of settleable solids detected in the stormwater discharged by the Sylvester Gulch outfalls doesn't exceed that which would naturally be present in stormwater in Sylvester Gulch had the Company not developed facilities therein. *See* H.R. Rep. No. 99-1004, at 151 (1986) (Conf. Rep.) (stormwater runoff at a mining site is "contaminated by contact" with overburden if its concentration of overburden exceeds natural background levels).  For example, the Company presented soil and water quality data, discharge monitoring reports, and computer modeling data indicating that the concentration of settleable solids present in the stormwater is at or below natural background levels. Multiple expert witnesses testified that, based on this data and the Company's best management practices, the concentration of settleable solids present in the stormwater is the result of "erosion of the natural undisturbed soils" rather than mining activity.

¶ 42     The Division didn't refute this evidence or otherwise present any evidence indicating that the stormwater discharged from the

Sylvester Gulch outfalls is contaminated by contact with overburden or any other material identified in Regulation 61's exemption provision. Indeed, the ALJ observed that "[t]he Division does not advance the argument that [the Sylvester Gulch outfalls] are in fact contaminated." Nor did the Division advance such an argument before the executive director or the district court, and it does not do so before this court on appeal.[9]

¶ 43    Accordingly, we reverse the district court's judgment in part and remand the case with directions to order the Division to remove the stormwater discharge regulations for the Sylvester Gulch outfalls from the Company's renewal permit.

### C.    Burden of Proof

¶ 44    The Company also contends that the renewal permit's terms and conditions regarding the train loading area outfall must be set aside because the ALJ improperly allocated the burden of proof at

---

[9] At oral argument, the Division's attorney suggested that contact is nearly synonymous with contamination, and we can tell by looking at monitoring reports. But the Division didn't make this argument in the proceedings below or its brief on appeal. Therefore, we don't need to consider it. *Weld Cnty. Colo. Bd. of Cnty. Comm'rs v. Ryan*, 2023 CO 54, ¶ 18 n.10 (an appellate court won't consider an argument raised for the first time at oral argument). In any event, this argument, too, fails to give effect to all the relevant language.

the adjudicatory hearing to the Company instead of the Division.[10] We disagree with this contention.

¶ 45    As noted, once the Division renews a permit, any person affected or aggrieved by the Division's determination may request an adjudicatory hearing to challenge the permit's terms and conditions and generally bears the burden of proof at the hearing. Dep't of Pub. Health & Env't Reg. 61.7(a), (d), 5 Code Colo. Regs. 1002-61.  But there are two circumstances in which the Division bears the burden of proof: (1) when "the Division initiated the permit revocation or modification" and (2) when "the Division denies renewal of a permit or changes the terms of a renewed permit and that denial or change is not based either upon significant changes in the facts relevant to water quality considerations or upon changes in the applicable statutes or regulations."  *Id.* at Reg. 61.7(d)(i)-(ii).

¶ 46    The Company argues that the second circumstance applies because the Division's decision to include the train loading area

---

[10] The Company also challenges the renewal permit's terms and conditions regarding the Sylvester Gulch outfalls on this basis. Because we conclude that the Sylvester Gulch outfalls are exempt from the permit requirement, we don't address that challenge.

outfall in the 2019 renewal permit wasn't based on significant changes in the law or facts. It reasons that the outfall existed before the Division renewed the Company's discharge permit in 2004 and that the Division "had all the necessary information" about the outfall at that time because (1) an inspector from the Division visited West Elk Mine in 2000, and (2) the Company's 1999 application included a map of the train loading area — a map substantially similar to the one the Company included in its 2008 application, which formed the basis for the 2019 renewal permit.

¶ 47 Even if the train loading area outfall existed before the Division renewed the Company's permit in 2004, substantial evidence in the record supports the ALJ's determination that the Division based its decision to include the train loading area outfall in the 2019 renewal permit on significant changes in facts it didn't learn about until the most recent renewal permitting process. The Division employee assigned to handle the Company's renewal permit testified that the Division administratively extended the Company's 2004 permit to gather more information after the Company had submitted its 2008 application. During the extension period, the employee "started fresh" by visiting a sedimentation

pond in the train loading area outfall and requesting additional information regarding the Company's stormwater management at the mine, including updated site maps and descriptions with the precise locations of all industrial stormwater outfalls not previously identified. And, in writing the Company's 2019 renewal permit, the employee determined the train loading area outfall required regulation based on her personal observation of it and the additional information the Company had provided.

¶ 48　　This evidence is sufficient to support the ALJ's findings. Therefore, we conclude that, with respect to the train loading area outfall, the ALJ properly allocated the burden of proof at the adjudicatory hearing to the Company.

¶ 49　　Because the Company doesn't otherwise challenge the renewal permit's inclusion of the train loading area outfall, we affirm the district court's judgment insofar as it affirms the Division's decision to regulate that outfall.

## IV. Disposition

¶ 50　　The district court's judgment is reversed in part and affirmed in part. We remand the case to the district court to order the Division to remove the stormwater discharge regulations for the

Sylvester Gulch outfalls (identified in the permit as Outfalls 25, 26, 27, 30, 32, 33, and 34) from the Company's 2019 renewal permit.

JUDGE KUHN and JUDGE MOULTRIE concur.